## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

LISA FLAGG on Behalf of Herself
and All Others Similarly Situated,

        Plaintiff,

        vs.

FIRST PREMIER BANK, a South
Dakota State-Chartered Bank,

        Defendant.

**CIVIL ACTION NO.**

**CLASS ACTION COMPLAINT**

**RACKETEER INFLUENCED AND
CORRUPT ORGANIZATION ACT**

**JURY TRIAL DEMANDED**

Plaintiff Lisa Flagg individually and on behalf of the Class and Sub-Class defined below, by her attorneys, makes the following allegations based upon information and belief, except as to allegations specifically pertaining to Plaintiff and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Plaintiff bring this class action against Defendant First PREMIER Bank ("First Premier" or "Defendant") to recover damages and other relief available at law and in equity on behalf of herself as well as on behalf of members of the class who have been injured by Defendant's participation in a scheme to allow illegal online payday lenders access to the nation's secure electronic payment transfer

1

network known as the "ACH Network" or "Automated Clearing House" to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including Georgia.

2.    This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendant, arising from its participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.    Payday loans—small loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.    At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap.  Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia, and the District of Columbia (the "banned states").

5.    Certain payday lenders, many of which are purportedly located on Indian reservations make use of the Internet to circumvent these prohibitions and

offer payday loans to borrowers residing in these states while ignoring the laws prohibiting those very loans (the "Illegal Payday Lenders"). These loans ("Illegal Payday Loans") feature interest rates of anywhere between 200% and 1500%.

6.     Illegal Payday Lenders' loan agreements with the borrowers often require an authorization allowing the illegal lender to "initiate" ACH transactions from the borrower's bank account. This authorization to "initiate" only allows a lender to *make a request* to an ACH Network member bank to be allowed entry to the ACH Network. The lender cannot "initiate" an entry into the secure ACH Network on its own.

7.     The rules and regulations governing the ACH Network require that an ACH Network member bank enter into a written agreement with merchants, like the Illegal Payday Lenders, who seek to initiate credits and debits electronically. This agreement describes in detail the scope of the relationship between the parties and has very specific requirements about what each party can and cannot do, as discussed further below.

8.     Because the Illegal Payday Lenders cannot introduce credit and debit entries into the network on their own, Illegal Payday Lenders' ability to defy the law of the banned states rests on the cooperation of financial institutions like First Premier that knowingly enter into written contracts with Illegal Payday Lenders to "originate" debits and credits from borrowers' bank accounts on the ACH Network. These

banks, known as Originating Depository Financial Institutions ("ODFIs"), are the Illegal Payday Lenders' sole access point to the ACH Network.

9.    Indeed, it would be impossible for Illegal Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in the banned states without First Premier's willingness to allow the Illegal Payday Lenders access to the ACH Network.

10.    First Premier, acting as an ODFI, actively participated in this unlawful scheme by granting Illegal Payday Lenders' requests to "initiate" ACH entries representing payday loan credits and debits to and from consumer checking accounts, and knowingly taking the affirmative steps to "originate" these illegal entries into the ACH Network, thereby enforcing debts First Premier knew to be unlawful.  First Premier profited from doing so.

11.    First Premier knew that it was crediting and debiting borrowers' accounts for unlawful purposes because it was required to undertake extensive due diligence procedures on all merchants attempting to initiate credit or debit entries on the ACH Network before entering into contractual arrangements with them.  Indeed, ODFIs like First Premier are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

12. First Premier knew that it was acting at the request of Illegal Payday Lenders and that the entries it originated on the ACH Network at the request of such Illegal Payday Lenders would credit or debit funds in states in which the Illegal Payday Lenders' loans were illegal and unenforceable.

13. First Premier's illegal schemes with Illegal Payday Lenders have victimized Plaintiff and thousands of others. Unless enjoined, First Premier will continue to engage in these schemes and cause substantial injury to borrowers.

## PARTIES

14. Plaintiff Lisa Flagg ("Flagg") is a citizen and resident of Decatur, Georgia.

15. Defendant First Premier is a South Dakota state-chartered bank with main offices at 601 South Minnesota Avenue, Sioux Falls, South Dakota.

## OTHER PERSONS AND ENTITIES

16. The "Illegal Payday Lenders" include, but are not limited to, Payment Direct, Inc., d/b/a First international SRS ("First Int'l"), an entity purportedly located at 524 West 9320 South Sandy, Utah 84070-6665. At all times relevant hereto, First Int'l was an entity engaged in the practice of making and did make illegal online payday loans to persons residing in the banned states where such loans are prohibited outright. First Int'l and its affiliated entities are the business of making and collecting

"unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

(A)    unenforceable because of state or federal laws against usury;

(B)    incurred in connection with the business of lending money at an usurious rate; and

(C)    the usurious rate was at least twice the enforceable rate.

17.    First Int'l requires all borrowers seeking a loan to electronically sign a "take-it-or-leave-it" payday loan agreement ("Loan Agreement"). The Loan Agreements are drafted solely by First Int'l and borrowers are not permitted to negotiate any terms set forth in the agreements.

18.    The First Int'l Loan Agreements contain the following arbitration agreement:

> **AGREEMENT TO ARBITRATE ALL DISPUTES**: By signing below and to induce us, (First International SAS), to process your application for a loan, you and we agree that any and all claims, disputes, or controversies that we or our services [sic] or agents have against you or that you have against us, our services [sic], agents, directors, officers and employees. That arises out of your application for one or more loans, the Loan Agreements that govern your repayment obligations, the loan for which you are applying or any other loan that we previously made or later makes [sic] to you, this Agreement To Arbitrate All Disputes, collection of the loan or loans, or alleging fraud  or misrepresentation, whether under the common law or pursuant to federal or state stature or regulation, or otherwise, including disputes as to the matters subject to arbitration, shall be resolved by a binding Individual (and not class) arbitration by and under the Code of Procedure of the National Arbitration Forum(NAF) in effect at the time the claim is filed. THEREFORE, THE ARBITRATION [SIC] SHALL NOT CONDUCT

CLASS ARBITRATION. THAT IS: THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION. This Agreement to Arbitrate All Disputes shall apply no matter by whom or against whom the claim is filed. Rules and forms of the NAF may be obtained and all claims shall be filed at any NAF office, on the World Wide Web at www.arb-forum.com, or National Arbitration Forum, P.O. Box 50191, Minneapolis, Minnesota 55405. If you are unable to pay costs at arbitration, your arbitration fees may be waived by the NAF. The cost of a participatory hearing, if one is held at your or our request will be paid solely by us if the amount of the claim is $15,000 or less. Unless otherwise ordered by the arbitrator, you and we agree to equally share the costs of a participatory hearing if the claim is for more than $15,000 or less than $75,000. Any participatory hearing will take place near your residence. The arbitration agreement Is made pursuant to a transaction involving Interstate commerce. It shall be governed by the Federal Arbitration Act 9 U.S.C. Sections 1-16. Judgement [sic] upon the reward may be entered by any party in any court jurisdiction. This Agreement to Arbitrate All Disputes is an independent agreement and shall survive the closing, funding, repayment and/or default of the loan for which you are applying.

**NOTICE**: You and we would have had a right or opportunity to litigate disputes through a court and have a judge or jury decide the disputes but have agreed instead to resolve disputes through arbitration.

19.     As set forth above, the First Int'l Loan Agreements use mandatory language requiring that arbitration take place before the National Arbitration Forum ("NAF") and under the NAF Code of Procedure ("NAF Code").

20.     Indeed, the arbitration agreements state that "all claims, disputes or controversies . . . ***shall be resolved*** by binding individual (and not joint) arbitration by and under the Code of Procedure of the National Arbitration Forum (NAF) in effect at the time the claim is filed" and that "[r]ules and forms of the NAF may be

obtained and all claims ***shall be filed*** at any NAF office, on the World Wide Web at www.arb-forum.com, by telephone at 800-474-2371, or at 'National Arbitration Forum, P.O. Box 50191, Minneapolis, Minnesota 55405.'"

21.    Among other things, the NAF Code requires that the "Code shall be administered ***only by*** the National Arbitration Forum ***or by any entity or individual providing administrative services by agreement with the National Arbitration Forum***. NAF Code, Rule 1(A). In other words, the NAF Code restricts the use of its rules to only those entities and individuals that have current agreements with the NAF.

22.    In 2007, the consumer advocacy group Public Citizen investigated the NAF and concluded that the forum was severely biased against consumers.[1] The following year, *Bloomberg Businessweek* published an article reporting that the NAF marketed its services to debt collectors and law firms. The article also noted that in California, the only state where arbitration results are made public, creditors won in 99.8% of NAF cases decided by arbitrators on the merits.[2]

---

[1] *See* John O'Donnell, *The Arbitration Trap: How Credit Card Companies Ensnare Consumers*, Public Citizen, Sept. 2007 (Jan. 21, 2015), http://www.citizen.org/documents/ArbitrationTrap.pdf.

[2] *See* Robert Berner and Brian Grow, *Banks vs. Consumers (Guess Who Wins)*, Bloomberg Businessweek, June 4, 2008 (Jan. 21, 2015), http://www.businessweek.com/stories/2008-06-04/banks-vs-dot-consumers-guess-who-wins.

23.     On July 14, 2009, after a year-long investigation, the Minnesota Attorney General filed suit against the NAF. The lawsuit accused the NAF of, among other things, actively concealing its affiliation with a New York hedge fund group that owns one of the country's major debt collection enterprises, working with creditors behind the scenes to draft arbitration clauses for creditors, advising creditors on arbitration legal trends, drafting claims to be filed against consumers, and soliciting creditors to use its arbitration services by marketing the forum as a more effective means of debt collection.

24.     Three days after the lawsuit was filed, the NAF entered into a consent judgment agreeing that it would no longer (a) accept any fee for processing any new Consumer Arbitration; (b) administer or process any new Consumer Arbitrations; (c) in any manner participate in any new Consumer Arbitration; and (d) attempt to influence the outcome of any arbitration proceeding currently pending before it. In accordance with the judgment, the NAF stopped performing consumer arbitrations in 2009.

25.     Where the parties' chosen arbitral forum has failed or is otherwise unavailable, Section 5 of the FAA may apply, in some circumstances, to allow the appointment of a substitute arbitrator. *See* 9 U.S.C. § 5 (noting that if there is a "lapse in the naming of an arbitrator" then "upon the application of either party to the controversy the court shall designate and appoint an arbitrator"). Section 5 does not,

however, permit the appointment of a substitute arbitrator where the choice of an arbitral forum "is an integral part of the agreement to arbitrate, rather than an ancillary logistical concern." *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) (citations and internal quotations omitted).

26. When an integral provision in an arbitration agreement cannot be enforced pursuant to its terms, Section 5 of the FAA "does not apply" and "the unavailability of the designated arbitrator will void the arbitration agreement." *Inetianbor v. CashCall, Inc.*, No. 13-60066-CIV, 2013 WL 1325327, at *4 (S.D. Fla. Apr. 1, 2013) (granting motion to reopen for lack of an available arbitral forum).

27. State and federal courts interpreting arbitration agreements nearly identical to those contained in the First Int'l Loan Agreements have found that NAF arbitral forum designations are integral to those agreements and thus refused to appoint a substitute arbitrator.[3]

---

[3] *See, e.g., Ranzy v. Tijerina*, 393 F. App'x. 174 (5th Cir. 2010); *Klima v. Evangelical Lutheran Good Samaritan Soc.*, No. 10-CV-1390-JAR-JPO, 2011 WL 5412216 (D. Kan. Nov. 8, 2011); *Ranzy v. Extra Cash of Texas, Inc.*, No. H-09-3334, 2010 WL 936471 (S.D. Tex. Mar. 11, 2010); *Khan v. Dell, Inc.*, No. 09–3703, 2010 WL 3283529, at *4 (D.N.J. Aug. 18, 2010) vacated, 669 F.3d 350 (3d Cir. 2012); *Carideo v. Dell, Inc.*, No. C06-1772JLR, 2009 WL 3485933 (W.D. Wash. Oct. 26, 2009); *Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803 (N.M. 2011); *Carr v. Gateway, Inc.*, 944 N.E.2d 327 (Ill. 2011); *Riley v. Extendicare Health Facilities*, 826 N.W.2d 398, 411 (Wis. Ct. App. 2012) *review denied*, 838 N.W.2d 636; *Sunbridge Ret. Care Assocs. LLC v. Smith*, 757 S.E.2d 157 (Ga. Ct. App. 2014); *Miller v. GGNSC Atlanta, LLC*, 746 S.E.2d 680 (Ga. Ct. App. 2013); *Apex 1 Processing, Inc. v. Edwards*, 962 N.E.2d 663 (Ind. Ct. App. 2012); *Licata v. GGNSC Malden Dexter LLC*, SUCV2011-02815-A, 2012 WL 1414881, *8 (Mass. Super. Ct. 2012); *Geneva–Roth, Capital,*

28.    On information and belief, a number of Illegal Payday Lenders, including other lenders affiliated with First Int'l, require borrowers to electronically sign the same or substantially similar payday loan agreements designating the NAF as the exclusive arbitral forum.

## JURISDICTION AND VENUE

29.    Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d), which confers jurisdiction upon this Court over the subject matter of this action.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under federal law.  This Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

30.    Alternatively, this Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because this lawsuit has been brought as a class action, the aggregate claims of the putative Class members exceed $5 million, exclusive of interest and costs, and one or more of the members of the putative Class is a resident of a different state than Defendant.

31.    This Court has personal jurisdiction over First Premier pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1965.

_____

*Inc. v. Edwards*, 956 N.E.2d 1195, 1202-03 (Ind. Ct. App. 2011); *GGNSC Tylertown, LLC v. Dillon*, 87 So.3d 1063, 1066 (Miss. Ct. App. 2011); *Stewart v. GGNSC-Canonsburg, L.P.*, 9 A.3d 215, 221 (Pa. Super. Ct. 2010).

32.     This Court has personal jurisdiction over First Premier pursuant to O.C.G.A. §9-10-91 in that First Premier has engaged in a continuous and systematic course of doing business in the state by, *inter alia*, maintaining a permanent office at 3333 Piedmont Road NE, Atlanta, Georgia.

33.     Alternatively, this Court has personal jurisdiction over First Premier pursuant to O.C.G.A. §9-10-91(2) in that First Premier personally or through an agent committed torts outside the state, causing injury to persons within the state, and should have reasonably expected its tortious acts to have consequences in the state and also derives substantial revenue from services rendered in the state or derives substantial revenue from interstate or international commerce.

34.     Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred here and because First Premier is subject to personal jurisdiction here.

## BACKGROUND FACTS
### Payday Loans

35.     A payday loan is a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to borrowers to provide funds in anticipation of an upcoming paycheck. A borrower obtaining a payday loan from an online lender must usually sign an ACH authorization agreement which purports to give the lender authority to electronically debit and credit loan transactions. To use the ACH

Network, however, the lender must find an ODFI Bank that is member of the ACH Network and willing to accept the lender's requests to "initiate" credit and debit entries on the loan. The ODFI is supposed to engage in extensive due diligence procedures prior to entering into an agreement with a merchant seeking to use the ACH Network to electronically process transactions.

36.     Only after the ODFI bank agrees that the merchant and its initiated entries are in full compliance with the ACH Network rules and state and federal law may it "originate" the entries into the secure ACH Network where the funds are electronically credited to or debited from the borrower's bank account. The ODFI banks serve as the bridge that connects the lender to the ACH Network and allows the lender, working through its specific ODFI bank(s), to electronically debit the borrower's deposit account for the loan payment amounts and associated fees. Without an ODFI bank's active participation to grant the lender's request to "initiate" debit entries and "originate" those entries into the ACH Network—the lender cannot reach the borrowers' account.

37.     Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

38.     Payday loans feature exorbitant interest rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

39.     The lenders engage in deceptive practices to ensure that the loan is never paid off.  Specifically, the lenders represent to borrowers that the total payment for satisfying the payday loan is the sum of the principal borrowed plus a one-time stated finance charge.  In reality, the lenders continuously debit purported "finance" charges from borrowers and do not apply those funds to the principal of the loan.  It is the rare instance that a borrower is actually debited in accordance with the already-astronomical terms stated in the payday loan agreement.

40.     To ensure the loans are never paid off (or, at least, last longer than their stated terms), payday lenders, including First Int'l, routinely "roll over" the borrower's loan balance without first securing affirmative consent to do so.  Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.  For this reason, borrowers are frequently charged substantially higher interest rates than the terms stated in the agreement.  For these and other reasons, Georgia, twelve other states and the District of Columbia have outlawed payday loans.

41.     In Georgia, a transaction is civilly usurious when it imposes an annual interest rate exceeding 16% per annum for loans with a principal amount of less than $3,000.  O.C.G.A. §7-4-2.  By statute, a usurious loan is void and unenforceable, and

the borrower is relieved from the obligation to repay both the principal and any accrued interest. Further, loans with an interest rate exceeding 5% per month are criminally usurious in Georgia under O.C.G.A. §7-4-18.

42. Illegal Payday Lenders, while not permitted to operate in the banned states, have simply moved to the Internet or other mediums in order to solicit desperate borrowers using an online application process. This scheme could not have been accomplished without the participation of ODFIs like First Premier who provide Illegal Payday Lenders with access to the ACH Network.


**The ACH Network**

43. The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing. Instead of using paper to carry necessary transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

44. The rules and regulations that govern the ACH network are established by NACHA (formerly the National Automated Clearing House Association) and the Federal Reserve. NACHA manages the development, administration, and governance of the ACH Network.

45.     First Premier is and was one of only thirty "Direct Financial Institution Members of NACHA" and influences the governance and direction of the ACH Network and the NACHA Operating Rules by participating in the NACHA Rule Making Process, voting directly on Rules ballots, and by participating in and leading NACHA Councils, committees, and initiatives.  As a Direct Financial Institution Member of NACHA, First Premier is eligible to serve on the NACHA Board of Directors and further shape regulatory, legislative, and ACH Network policies.

46.     The *NACHA Operating Rules* are an extensive set of rules and regulations that govern and provide ACH Network participants with the legal framework for the ACH Network.  The *NACHA Operating Guidelines* provide guidance on implementing the Operating Rules (the NACHA Operating Rules & Guidelines collectively referred to herein as "NACHA Rules").  The NACHA Rules "serve[] as the definitive source of information governing the exchange and settlement of electronic fund transfers through the ACH Network."  NACHA 2013 Operating Rules, Introduction.

47.     An ACH transaction takes place in multiple steps and, under the NACHA Rules, entries may be rejected at any point if they are not in compliance with the NACHA Rules or are illegal under federal or state law.  The first step is having a merchant, in this case the Illegal Payday Lenders, receive authorization from a party (in this case the borrower), referred to as the "Receiver" to initiate credits or

debits on the ACH Network from the Receiver's bank account—typically called an "Authorization to Initiate ACH Transactions."  This authorization allows the merchant to take the next step in the process, which is to "initiate" an entry into the ACH Network.  That step requires an ODFI bank participating in the ACH Network that has previously entered into a separate written contract with the merchant to "originate" the lender's request to "initiate" credit or debit entries into the network. Although it is the party "initiating" entries, merchants like Illegal Payday Lenders are known as "Originators" under the NACHA Rules (and are referred to as "Originators" herein) even though the ODFI banks are the parties tasked with "originating" the credit or debit entries "initiated" by the Originators.

48.     Under the NACHA Rules, Originators like the Illegal Payday Lenders do not have the ability to introduce a debit entry into the ACH Network on their own. Originators can only make a request to "initiate" a debit entry to the specific ACH member ODFI bank or banks with which they have entered into a contractual relationship to grant them access to the ACH Network.  Because ODFI banks are tasked with this important "gatekeeping" function, however, the ODFI banks are required to fully audit and vet the Originator's business to ensure it complies with NACHA Rules, and state and federal laws before entering into a contractual arrangement with that Originator.

49.     If the ODFI is satisfied that the Originator (here the Illegal Payday Lender) is in compliance, it may, pursuant to its agreement with the Originator, originate the ACH debit or credit to a pass-through clearing house known as an "ACH Operator."  Under the NACHA Rules, the ACH Operator processes entries between the ODFI and the Receiver's bank, known as the Receiving Depository Financial Institution ("RDFI").  The RDFI is also a member of the ACH Network, and is the entity that actually credits or debits its customer's checking or savings account.

50.     Also active on the ACH Network are "Third Party Service Providers" which are entities other than the Originator, ODFI, Receiver or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.  A "Third-Party Sender" initiates entries into the ACH Network on behalf of an Originator.  An ODFI's obligations are the same whether it originates for an Originator directly, or for a Third-Party Sender acting on behalf of an Originator.

51.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States.  These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

52.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and

merchants.  The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems.  The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users.  Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

53.    The NACHA Rules apply to and govern every member that chooses to participate in the ACH Network, and are admittedly structured around the significant obligations of ODFIs and RDFIs: "The [NACHA] *Rules* are organized around the types of participants in the ACH Network and acknowledge the major roles played by originating and receiving financial institutions [and] therefore dedicate[e] large sections to each of these roles.  ***The [NACHA] Rules explicitly recognize that originating financial institutions are the entry points into the ACH Network for corporate users and Third Parties, and that these financial institutions are responsible for those parties' compliance with the [NACHA] Rules***."  NACHA 2013 Operating Rules, Introduction (emphasis added).  The specific responsibilities of ODFIs are discussed in detail below.

**ODFIs Have Special Duties under NACHA
Operating Rules and Guidelines**

54.  NACHA characterizes ODFIs as "the gatekeepers of the ACH Network."  As the party that enables an Originator – such as an Illegal Payday Lender – to initiate debit entries on the ACH Network, NACHA Operating Rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have an arrangement with a Third-Party Sender that has such an Origination Agreement.  NACHA 2013 Operating Rules, Section 2.2, Subsection 2.2.1.

55.  Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party Sender  . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules."  NACHA 2013 Operating Rules, Section 2.1.

56.  NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information and reporting systems to monitor and mitigate risk."  *See* NACHA 2013 Operating Guidelines, Chapter 4 General Rules, p. OG21.

57.  The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are subject to the NACHA Operating Rules and applicable U.S. law when transmitting

these entries." NACHA 2013 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, p. OG17.

58.     Section 2.4 of the NACHA Rules provides for "General Warranties and Liabilities of Originating Depository Financial Institutions" and holds that when an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that, *inter alia*, "the entry has been properly authorized by the Originator and the Receiver in accordance with these Rules." NACHA 2013 Operating Rules Section 2.4, Subsection 2.4.1.1 (a), p. OR7.

59.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Payday Lenders), ***an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules***. NACHA 2013 Operating Rules Section 2.3, Subsection 2.3.2.3 (b), p. OR6. (emphasis added)

60.     Further, Subsection 2.2.1.1-2 of the NACHA Rules requires ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries which must include: an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

61.     ODFIs also have clear duties to "know your customer" and the NACHA Rules make clear that they are intended to reflect that principle.  NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

62.     On March 14, 2013, NACHA issued an advisory in response to negative press reports about collusion of ACH members with payday lenders.  In the release, NACHA reiterated the important policing duties of ODFIs:   "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its name . . . .  In the case of authorizations from consumers, the NACHA Rules are explicit that, among other things, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.'  *If a purported authorization is invalid under applicable law, it does not meet this standard.*"  (Emphasis added).

63.     NACHA went on to say:

> Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs should, among other things, (i) exercise appropriate risk-based diligence when bringing on new Originators and Third-Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action.  For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their

historic patterns of unauthorized returns and whether they
are engaged in legitimate business activities.

64.    The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

65.    In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Illegal Payday Lenders or their Third-Party Senders could violate NACHA rules. In the letter, NACHA stated that under its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

### ODFIs Have Additional Duties With Regard to Debit Authorizations Purportedly Made Via the Internet under NACHA Operating Rules and Guidelines

66.    Each entry into the ACH Network is coded pursuant to a NACHA entry code that identifies the type of activity the entry represents. The ACH Network has at least 23 standard entry codes, and NACHA has identified two specific entry codes that are used by high risk Originators such as Illegal Payday Lenders: "ACH WEB" and "ACH TEL".

67.    For example, under the NACHA Rules, a debit entry to a consumer account originated based on an authorization that is communicated, other than by an oral communication, from the Receiver to the Originator via the Internet is coded as

a "WEB" entry on the ACH transaction record. *See*, *e.g.*, 2013 NACHA Operating Rules Subsection 2.5.17.

68.     The NACHA Operating Rules require that, "[a]n ODFI must perform, or ensure that its Originator or Third-Party Sender performs, the requirements of Subsection 2.5.17.2 (Authorization of WEB Entries) and Subsection 2.5.17.3 (WEB Annual Audit) [see] below before permitting an Originator or Third-Party Sender to initiate a WEB Entry." 2013 NACHA Operating Rules Subsection 2.5.17.1.

69.     With regard to WEB entries, Subsection 2.5.17.4 of the NACHA Operating Rules provides:

> In addition to the other warranties contained within these Rules, an ODFI originating a WEB Entry warrants to each RDFI and ACH Operator that:
>
> (a) *Fraud Detection Systems*.   The Originator has established and implemented a commercially reasonable fraudulent transaction detection system to screen the WEB Entry.
>
> (b) *Verification of Receiver's Identity*.  The Originator has established and implemented commercially reasonable methods of authentication to verify the identity of the Receiver of the WEB Entry.
>
> (c) *Verification of Routing Numbers*.  The Originator has established and implemented commercially reasonable procedures to verify that the routing number used in the WEB Entry is valid.

70.    In addition to the NACHA Operating Rules, with regard to Internet initiated entries, NACHA recommends the following as sound business practices in Chapter 48 *Internet Initiated /Mobile Entries (WEB)* of its Operating Guidelines:

**RESPONSIBILITIES OF ODFIs**

*Agreements with Originators*

Each ODFI that chooses to transmit WEB entries on behalf of its Originators should make modifications to its agreements with its Originators to address the origination of these entries. These modifications should address:

- the allocation of liability between the Originator and ODFI for WEB transactions, and

- any specific processing obligations relating to such transactions.

In addition, these agreements should address the procedures, practices, and systems Originators are using to comply with their obligations under the *NACHA Operating Rules* governing WEB entries. For example, the agreement may need to address the authentication methods and the fraudulent transaction detection systems the Originators are using for WEB entry transactions. ODFIs may also want to see proof of the Originator's annual data security audit prior to or as a condition of transmitting WEB entries for the Originator.

*****

**Warranties and Liabilities**

In addition to all other ODFI warranties contained within the NACHA Operating Rules, each ODFI that chooses to transmit WEB entries on behalf of its Originators also warrants that:

- Each Originator for which the ODFI transmits WEB entries has employed a commercially reasonable fraudulent transaction detection system to screen the entries;

- Each Originator of WEB entries has employed commercially reasonable methods of authentication to verify the identity of the Receiver;

- Each Originator has taken commercially reasonable steps to verify that routing numbers are valid; and

- Each Originator has conducted an annual data security audit to ensure that the financial information that the Originator obtains from Receivers is protected by security practices that include adequate levels of:

  - physical security to protect against theft, tampering, or damage,

  - personnel and access controls to protect against unauthorized access and use, and

  - network security to ensure secure capture, transmission, distribution, and storage until destruction of financial information.

ODFIs must know their Originators and monitor WEB entries because there are additional risk factors to consider with this type of transaction stemming from the inherent risk of transactions that are conducted in an Internet and non face-toface [sic] environment.

All of these additional warranties should be explicitly addressed in ODFI agreements with Originators because there is a commercially reasonable standard that applies to several of the warranties, ODFIs need to be aware of what procedures, practices, and systems their Originators have deployed to meet these requirements.

**The OCC Has Issued Guidance to All Banks
On Managing the Risks of ACH Activity**

71. The Office of the Comptroller of the Currency ("OCC") supervises national banks.

72. On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

73. The guidance advised:

**High-Risk Activities**

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

74. In a footnote to the guidance, the OCC made the risk to banks even clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's reputation *when originators or third-party senders facilitate or engage in activities that violate criminal laws*." (Emphasis added)

75.     On April 24, 2008, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity initiated by Third-Party Processors, cautioning that:

> Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. ***Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity***. (Emphasis added)

76.     The guidance reminded banks that they:

> . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.
>
> *******
>
> By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions.  In the event a bank identifies fraudulent or other improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

77.     The guidance concludes that:

The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue. However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities. At a minimum, bank programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and monitor processor relationships for activity indicative of fraud.

**The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties**

66. The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks and its pronouncements and guidance are closely monitored even by financial institutions that are regulated by other federal regulators.

67. On February 25, 2005, the FDIC issued guidance regarding payday lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders initiate through Third-Party Senders. The FDIC guidance makes clear that:

The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance with policies and applicable laws. Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

68.     On June 6, 2008, the FDIC issued additional "Guidance for Managing

Third-Party Risk" which began by noting that:

> An institution's board of directors and senior management
> are ultimately responsible for managing activities
> conducted through third-party relationships, and
> identifying and controlling the risks arising from such
> relationships, to the same extent as if the activity were
> handled within the institution.

69.     Among the risks to banks the FDIC identified in its June 6, 2008

"Guidance for Managing Third-Party Risk" was:

> Compliance risk.  Compliance risk is the risk arising from
> violations of laws, rules, or regulations, or from
> noncompliance with internal policies or procedures or with
> the institution's business standards.  This risk exists when
> the products or activities of a third party are not consistent
> with governing laws, rules, regulations, policies, or ethical
> standards. For example, some third parties may engage in
> product marketing practices that are deceptive in violation
> of Section 5 of the Federal Trade Commission Act . . .
> Compliance risk is exacerbated when an institution has
> inadequate oversight, monitoring or audit functions.

70.     Accordingly, the FDIC advises banks to engage in "Due Diligence in

Selecting a Third Party":

> Following an assessment of risks and a decision to proceed
> with a plan to establish a third-party relationship,
> management must select a qualified entity to implement the
> activity or program.  The due diligence process provides
> management with the information needed to address
> qualitative and quantitative aspects of potential third
> parties to determine if a relationship would help achieve the
> financial institution's strategic and financial goals and
> mitigate identified risks. Not only should due diligence be

performed prior to selecting a third party, but it should also be performed periodically during the course of the relationship, particularly when considering a renewal of a contract.

******

Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

71.     On January 31, 2012, the FDIC issued revised guidance describing potential risks associated with relationships with third-party entities that process payments for telemarketers, online businesses, and other merchants.  In a footnote to the guidance, the FDIC provided, "[e]xamples of telemarketing, online businesses, and other merchants that may have a higher incidence of consumer fraud or potentially illegal activities or may otherwise pose elevated risk" which included "payday or subprime loans."

72.     The FDIC advised banks that:

. . . payment processors that deal with telemarketing and online merchants may have a higher risk profile because such entities have tended to display a higher incidence of consumer fraud or potentially illegal activities than some other businesses.  Given this variability of risk, payment processors must have effective processes for verifying their merchant clients' identities and reviewing their business practices.  Payment processors that do not have such processes can pose elevated money laundering and fraud

risk for financial institutions, as well as legal, reputational, and compliance risks if consumers are harmed.

73.     The FDIC made clear that banks faced potential liability if they failed to

adequately manage their relationships  with payment processors:

> Deposit relationships with payment processors expose financial institutions to risks not customarily present in relationships with other commercial customers.   These include increased operational, strategic, credit, compliance, and transaction risks.   In addition, financial institutions should consider the potential for legal, reputational, and other risks, including risks associated with a high or increasing number of customer complaints and returned items, and the potential for claims of unfair or deceptive practices.  ***Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices.***   In such cases, the financial institution and responsible individuals have been subject to a variety of enforcement and other actions. ***Financial institutions must recognize and understand the businesses and customers with which they have relationships and the liability risk for facilitating or aiding and abetting consumer unfairness or deception*** under Section 5 of the Federal Trade Commission Act.  (Emphasis added).

74.     On February 15, 2013, M. Anthony Lowe, Regional Director of the

FDIC's Chicago Regional Office wrote to an Ohio-chartered bank following a

Compliance and Risk Management visitation of that bank after the FDIC became

aware that the bank had been processing transactions on behalf of payday lenders.

The letter set forth the FDIC's position with regard to banks' processing of such

transactions:

> The focus of our visitation was on the risk associated with this relationship (with a payday lender), compliance with consumer protection laws and regulations, and the effectiveness of Board and senior management due diligence and oversight of this relationship and the corresponding payday lending-related activities. It is our view that payday loans are costly, and offer limited utility for borrowers, as compared to traditional loan products. Furthermore, the [**Redacted**] relationship carries a high degree of risk to the institution, including third-party, reputational, compliance, and legal risk, which may expose the bank to individual and class actions by borrowers and local regulatory authorities. Consequently, we have generally found that activities related to payday lending are unacceptable for an insured depository institution.

**First Premier Knew the Illegal Payday Lenders Were Engaged In Unlawful Activities**

75. At the time First Premier originated the entries on the ACH Network referenced herein, it knew the identity of the Illegal Payday Lenders, it knew the lenders were engaged in the business of making payday loans, and it knew the Illegal Payday Lenders were engaged in the business of making payday loans in states where payday lending was unlawful.

76. According to its own figures, NACHA represents more than 10,000 financial institutions via 17 regional payments associations and direct membership. Approximately 99% of these banking institutions have never originated entries on the ACH Network at the request of an unlicensed, online payday lender.

77. In contrast, First Premier was and is one of the most active originators of ACH WEB and ACH TEL entries on the ACH Network for high-risk originators

such as unlicensed online payday lenders. First Premier originated entries on the ACH Network at the request of unlicensed payday lenders because it could charge payday lenders higher fees to originate high-risk payday loans entries than are customarily paid for originations on the ACH Network by legitimate originators. First Premier charged these higher fees because it knew the transactions it was originating were illegal.

78.     The higher origination fees charged to the payday lenders reflected the calculated risk First Premier took knowingly to assist "high-risk" originators like Illegal Payday Lenders in violating the laws of the banned states, the NACHA Rules, and OCC and FDIC guidelines. The overwhelming majority of ODFIs on the ACH Network refused to originate entries on behalf of these same Illegal Payday Lenders.

79.     Without direct, unilateral access to borrowers' bank accounts provided by ODFI banks willing to abandon their "gatekeeper" responsibilities to guard the secure ACH Network, the Illegal Payday Lenders would need borrowers to take an affirmative step such as writing and mailing a check for each loan repayment. Borrowers that find lenders' demands for repayment to be inconsistent with their respective understandings of their loan agreements would have an opportunity— before money is unilaterally taken from their bank accounts by the ODFI banks "originating" the debit entries requested by the lenders—to question, reject, or

dispute the demand for payment. The FTC has warned borrowers about this practice and sued certain payday lenders for engaging in similar conduct.[4]

80. Characteristics of Illegal Payday Lender transactions themselves also notified ODFIs of unlawful activity.

81. Whether ODFIs contract with Illegal Payday Lenders or Third-Party Senders acting on behalf of the lenders, ACH debits originated at the request of Illegal Payday Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

82. Chief among these "red flags" is high return rates on ACH debit transactions. An ACH debit transaction may be returned for numerous reasons including, *inter alia¸* the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

83. ACH debits originated at the request of the Illegal Payday Lenders far exceed the return rate for all electronic payments of less than 1%. Although high-return rates alerted ODFIs of potential illegal activity, First Premier ignored these warnings—not only because it already knew the business of the Illegal Payday Lenders through their required due diligence obligations, but also because the ODFIs

---

[4] <https://www.consumer.ftc.gov/articles/0249-online-payday-loans> (last visited on January 30, 2015).

charge fees on every return payment made by the Originator. Thus, they can potentially reap twice the profit in fees associated with unauthorized payments.[5]

84.     In addition to NACHA Rules discussing the importance of investigating high return rates (*see* 2013 NACHA Rules, subsection 2.17.2.2 "ODFI Reduction of Return Rate"), the banking industry has been informed that high rates of returned transactions – regardless of the specific reason for the return – indicate suspicious activity. As noted by the Financial Crimes Enforcement Network of the U.S. Department of the Treasury ("FinCEN"):

> *Fraud*: High numbers of consumer complaints about Payment Processors and/or merchant clients, and particularly **high numbers of returns or chargebacks (aggregate or otherwise), suggest that the originating merchant may be engaged in unfair or deceptive practices or fraud**, including using consumers' account information to create unauthorized RCCs or ACH debits.

*FinCEN Advisory: Risk Associated with Third-Party Payment Processors*, FIN-2012-A010 (October 22, 2012) (emphasis added).

85.     First Premier knowingly ignored the nature of the Illegal Payday Lenders' business, ignored their usage of entry codes known to be used by high risk

---

[5] For example, between 2003 and 2006, Wachovia Bank collected millions of dollars in origination fees by debiting funds for fraudulent telemarketers. The OCC asserted that some of the bank's officials knew about the deceptive telemarketing practices but failed to take quick action to resolve the problem because high-return rates alone netted Wachovia $1.45 million in return item fees. Ultimately Wachovia agreed to pay over $150 million in restitution to defrauded consumers, a $10 million civil money penalty and $8.9 million in contributions to consumer education.

Originators such as Illegal Payday Lenders: ACH WEB and ACH TEL, and ignored excessively high-return rates and charge backs in order to turn extra profit.

## FACTS AS TO PLAINTIFF LISA FLAGG

86.     In or about August 2012, First Int'l acquired the customer list of online payday lender First National Funding, Inc. for the sole purpose of soliciting and making new loans to First National Funding, Inc.'s previous or pending customers.

87.     In or about August of 2012, First Int'l solicited Plaintiff Flagg to make a new payday loan and directed Plaintiff to a payday loan website operated by First Int'l.

88.     On or about August 31, 2012, Plaintiff Flagg received a payday loan in the amount of $250.00 from First Int'l. The finance charge on the loan was $85.00. The entirety of the interest plus principal, which equaled $335.00, was scheduled to be paid in 22 days.  The nominal annual interest rate stated in the loan agreement was 899.46%. Plaintiff was required to provide an ACH Authorization for her checking account with JPMorgan Chase Bank, N.A. in order to obtain the loan.

89.     Even if timely paid off, payday loans offered by First Int'l automatically renew unless the borrower affirmatively declines the renewal option at least three business days prior to the loan due date. This is a common tactic used by illegal payday lenders to ensure their loans "roll-over" time and again.

90.     As a result, on or about September 14, 2012, and October 12, 2012, First Int'l initiated debit transactions in the amount of $335.00 from Plaintiff Flagg's checking account in Georgia through the ACH Network. The ODFI originating these transactions was Defendant First Premier.

91.     First Premier derived a benefit through the receipt of fees for its origination of debit entries on the ACH Network initiated by First Int'l (or Third-Party Senders acting on their behalf) and received by Plaintiff.

92.     On January 5, 2015, Plaintiff's counsel sent a letter to the NAF attempting to initiate arbitration against First Int'l and First Premier in accordance with the NAF Code and terms of the First Int'l Loan Agreement. The letter cited the pertinent portions of the First Int'l Loan Agreement and enclosed copies of (1) Plaintiff's complaint, (2) the loan agreement between First Int'l and Plaintiff Flagg, and (3) an affidavit from Plaintiff's counsel verifying the allegations in the Complaint. A true and accurate copy of this correspondence is attached as Exhibit A.

93.     On January 8, 2015, Plaintiff's counsel received a response letter from the NAF declining to initiate arbitration. The letter from the NAF stated:

> We are in receipt of your enclosed correspondence.
>
> It appears as though you are attempting to file a Claim with us. Please be advised that we are no longer able to accept arbitration claims

involving consumers pursuant to a Consent Judgment entered in Hennepin County District Court in July 2009 between the Minnesota Attorney General and the National Arbitration Forum.

In view of the above, we are not able to assist you in filing this Arbitration Claim. Your correspondence is being returned to you and no file has been opened regarding this matter.

A true and accurate copy of this correspondence is attached as Exhibit B.

94.    Because the arbitral forum designated in the First Int'l Loan Agreement is unavailable, Plaintiff's action is properly before this Court.

## CLASS ACTION ALLEGATIONS

95.    <u>Description of the Class and Sub-Class</u>:  Plaintiff brings this class action on behalf of herself and a Class and Sub-Class defined as follows:

i.    All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by First Premier as an ODFI on behalf of an Illegal Payday Lender in repayment of a loan which was illegal under the law of their respective state at the time of the debit; and whose loan agreement designated the National Arbitration Forum as the exclusive arbitral forum (the "Class").

ii.    All natural persons within the state of Georgia whose accounts were debited via an ACH entry originated by First Premier as an ODFI on behalf of an Illegal Payday Lender in repayment of a loan which was illegal under Georgia law at the time of the debit; and whose loan agreement designated the National Arbitration Forum as the exclusive arbitral forum (the "Sub-Class").

96.    Excluded from the Class and Sub-Class are Defendant's officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns.  Also excluded from the Class and Sub-Class is any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

97.    <u>Numerosity</u>:  The proposed Class and Sub-Class are so numerous that individual joinder of all members is impracticable.

98.    <u>Common Questions of Law and Fact Predominate</u>:  There are many questions of law and fact common to Plaintiff and the Class and Sub-Class, and those questions substantially predominate over any questions that may affect individual Class and Sub-Class members.  Common questions of law and fact include: (a) whether payday loans made to the Class and Sub-Class are usurious and unenforceable under state or federal law; (b) whether debts owed to payday lenders by the Class and Sub-Class are incurred in connection with the business of lending money at an usurious rate; (c) whether the usurious rate on such payday loans was at least twice the enforceable rate under the law of the states in which the Class and Sub-Class reside; (d) whether First Premier's collection of the illegal or unenforceable debts was made with actual or constructive knowledge of the illegality of the loans; (e) whether First Premier's collection of the illegal debts was the proximate cause of injuries suffered by the Class and Sub-Class; (f) whether the Class

and Sub-Class suffered an injury to property by the debiting of their accounts by First Premier; and (g) whether the running of the statute of limitations for the claims of the Class and Sub-Class should be equitably tolled.

99. <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the members of the Class and Sub-Class.  Plaintiff and all members of the Class and Sub-Class have been similarly affected by the actions of First Premier.

100. <u>Adequacy of Representation</u>:  Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation.  Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the Class and Sub-Class, and have the financial resources to do so.

101. <u>Superiority of Class Action</u>:  Plaintiff and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of First Premier's unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the present controversy.  Individual joinder of all members of the Class and Sub-Class is impractical.  Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed.  Individual litigation magnifies the delay and expense to all parties in the court system of

resolving the controversies engendered by First Premier's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) by First Premier**
**(On behalf of the Class and Sub-Class)**

102.    Plaintiff incorporates by reference the preceding paragraphs.

103.    First Premier is a "person" as defined by 18 U.S.C. § 1961(3).

104.    The financial entity participants in the ACH Network are comprised of the following:

    a.    "Originators" which include any party that "initiates" entries into the ACH Network pursuant to an Origination Agreement with an ODFI or Third-Party Sender acting on behalf of an ODFI, including Illegal Payday Lenders;

    b.    "Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries. A "Third-Party Sender" is a type of Third-Party Service

Provider that enters into an agreement with an Originator to "initiate" entries on its behalf and then enters into an Origination Agreement with an ODFI to "originate" the entries initiated by the Third-Party Sender on behalf of the Originator;

c. "ODFIs" which include all financial institutions participating in the ACH Network that originate ACH entries pursuant to an Origination Agreement with Originators or Third-Party Senders and that agree to abide by the NACHA Rules, including First Premier;

d. "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that receive entries from ODFIs and process the entries to the appropriate RDFI; and

e. "RDFIs" which include all depository financial institutions participating in the ACH Network that receive ACH transaction instructions from ODFIs through the ACH Operator and credit or debit funds to or from its customers' accounts and that are qualified to receive ACH entries and agree to abide by the NACHA Rules.

105.    These financial entity participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Network Enterprise") in that:

a. Participants in the ACH Network Enterprise share the common lawful and legitimate purpose of facilitating batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b. To achieve this common purpose, participants in the ACH Network Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c. The ACH Network Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

106. The ACH Network Enterprise is an enterprise engaged in, and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce. First Premier is associated with the ACH Network Enterprise through its role as an ODFI within the ACH Network Enterprise.

107. First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Network Enterprise. Under the NACHA Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier, whether initiated by an Originator, or by a Third-Party Service Provider acting on the Originator's behalf.

First Premier has decision-making authority within the ACH Network Enterprise regarding which Originators to accept or reject into the ACH Network.

108.   As one of only thirty "Direct Financial Institution Members of NACHA" First Premier also plays a distinct role in the operation, management, and control of the ACH Network Enterprise by participating in the NACHA rule making process, voting directly on rules ballots, and by participating in and leading NACHA councils, committees, and initiatives.

109.   In order to initiate debit entries from borrower checking accounts on the ACH network, Illegal Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit.  Pursuant to NACHA Rules, when an ODFI originates an ACH entry, it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Rules and state and federal laws.

110.   While First Premier shares in the common purpose of the ACH Network and uses the ACH Network to originate lawful and legitimate transactions, First Premier also uses its role within the ACH Network Enterprise to conduct unlawful debt collection by granting Illegal Payday Lenders access to the ACH Network and "originating" debit entries from the bank accounts of  persons residing in states in which payday lending is illegal "initiated" by the Illegal Payday Lenders (or Third-

Party Senders working on their behalf) for the purpose of repaying usurious and illegal loans. The loans made by Illegal Payday Lenders are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a. unenforceable because of state or federal laws against usury;

    b. incurred in connection with the business of lending money at an usurious rate; and

    c. the usurious rate was at least twice the enforceable rate.

111. First Premier, in its role as an ODFI in the ACH Network Enterprise, originated debit entries on the ACH Network at the request of Illegal Payday Lenders (or Third-Party Senders acting on the Illegal Payday Lenders' behalf) that First Premier knew routinely violate State law; and originated debit entries that First Premier knew were in violation of state law, the NACHA Rules and FDIC and OCC guidelines.

112. Pursuant to the fraudulent scheme, First Premier participated in the collection of unlawful debts in that:

    a. Illegal Payday Lenders, or Third-Party Senders acting on their behalf, "initiated" debit entries that were subsequently "originated" into the ACH Network by First Premier whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b. First Premier originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c. First Premier knew that the Illegal Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of the Illegal Payday Lenders in violation of 18 U.S.C. §1962(c).

113.   Accordingly, First Premier has used its gatekeeping role as an ODFI in the ACH Network to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Network Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

114.   As a direct and proximate result of First Premier's violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

**SECOND CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(d) by First Premier**
**(On behalf of the Class and Sub-Class)**

115.   Plaintiff incorporates by reference the preceding paragraphs.

116.   First Premier and Illegal Payday Lenders, or Third-Party Senders acting on their behalf, reached an agreement to use their respective roles within the ACH Network Enterprise to facilitate payday loans to borrowers residing in states that banned the practice and collect usurious interest rates in violation of state law. Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

a.   unenforceable because of state or federal laws against usury;

b.   incurred in connection with the business of lending money at an usurious rate; and

c.   the usurious rate was at least twice the enforceable rate.

117.   In furtherance of their agreement, First Premier and Illegal Payday Lenders agreed to take certain acts to facilitate the collection of unlawful debts:

a.   Illegal Payday Lenders (or Third-Party Senders acting on behalf of the Illegal Payday Lenders) agreed to "initiate" ACH debit entries to be originated on the ACH Network by First Premier whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b.   First Premier agreed to "originate" ACH debit entries initiated by Illegal Payday Lenders and receive payment for doing so despite

48

their unlawful nature by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

   c. First Premier knew that the Illegal Payday Lenders were payday lenders and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states on behalf of the Illegal Payday Lenders in violation of 18 U.S.C. §1962(c).

118. Accordingly, First Premier intentionally conspired and agreed with Illegal Payday Lenders to use its gatekeeping role as an ODFI in the ACH Network to directly and indirectly conduct and participate in the conduct of the affairs of the ACH Network Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

119. As a direct and proximate result of First Premier and Illegal Payday Lenders' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier and such injury was reasonably foreseeable.

**THIRD CLAIM FOR RELIEF**
**Unjust Enrichment**

**(On behalf of the Class and Sub-Class)**

120.   Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

121.   First Premier in its role as an ODFI, originated debit entries on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

122.   First Premier charged and retained a transaction fee for each debit entry it originated on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

123.   First Premier received and retained wrongful benefits from Plaintiff and the Class and Sub-Class in the form of such transaction fees.

124.   As a result of First Premier's wrongful conduct as alleged herein, First Premier has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class and Sub-Class.

125.   First Premier's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

126.   It is inequitable for First Premier to be permitted to retain the benefits it received, without justification, from originating debit entries on the ACH Network

initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf). First Premier's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

127. The financial benefits derived by First Premier rightfully belong to Plaintiff and members of the Class and Sub-Class. First Premier should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Class and Sub-Class all wrongful or inequitable proceeds received from them. A constructive trust should be imposed upon all wrongful or inequitable sums received by First Premier traceable to Plaintiff and the members of the Class and Sub-Class.

128. Plaintiff and members of the Class and Sub-Class have no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Georgia Payday Lending Act
### (On behalf of the Sub-Class)

129. Plaintiff incorporates by reference the preceding paragraphs.

130. Pursuant to O.C.G.A. §16-17-2, it is unlawful to engage in any business which consists of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less, unless:

> Such person is engaging in financial transactions permitted pursuant to:
>
> (A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";

(B) The laws regulating state and federally chartered credit unions;

(C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;

(D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";

(E) Chapter 4 of Title 7, relating to interest and usury;

(F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or

(G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;

(2) Such loans are lawful under the terms of:

(A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";

(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or

(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;

(3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or

(4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount

of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

131. As set forth more fully above and incorporated by reference herein, the Illegal Payday Loans made to Plaintiff in Georgia featured a principal amount of less than $3,000 and neither the Illegal Payday Lender nor the Illegal Payday Loan qualified for any exception available under O.C.G.A. §16-17-2.

132. First Premier aided and abetted the Illegal Payday Lenders' violations of the Georgia Payday Lending Act by providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme.

133. In providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme, First Premier knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Payday Lenders.

134. At the time First Premier provided the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme, it knew the identity of the Illegal Payday Lenders, including their unlawful activity.

135. First Premier was prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

136. First Premier was aware of the illegal nature of the lending activities of the Illegal Payday Lenders through due diligence procedures.

137. As a result of First Premier's conduct, the Sub-Class was harmed.

138. As a result of First Premier's knowing participation in the making of illegal payday loans, it is liable as an aider and abettor to the violations of the Georgia Payday Lending Act referenced herein.

**WHEREFORE**, Plaintiff on her own behalf and on behalf of the Class and Sub-Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)  Under 18 U.S.C. § 1964(c), awarding each  member of Class and Sub-Class damages from First Premier for First Premier's violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their accounts in which First Premier was the ODFI and which represented repayment of a loan from an Illegal Payday Lender, trebled;

(b)  Under 18 U.S.C. § 1964(d), awarding each member of the Class and Sub-Class damages from First Premier for First Premier's violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from an Illegal Payday Lender, trebled;

(c)     Permitting each member of the Class and Sub-Class to recover damages in restitution *at law* from First Premier consisting of a refund of every ACH debit from their accounts in which First Premier was the ODFI and which represented repayment of a loan from an Illegal Payday Lender;

(d)     Awarding the Sub-Class damages against First Premier for its aiding and abetting in the violations of the Georgia Payday Lending Act;

(e)     Awarding Plaintiff attorneys' fees and costs in pursuing this action; and

(f)     Awarding such other and further relief as this Court deems just, proper and equitable.

## JURY DEMAND

Plaintiff hereby demands a jury trial in the instant action.

Dated:  January 30, 2015

Respectfully submitted,

**DARREN KAPLAN LAW FIRM, P.C.**

By:     __s/Darren T. Kaplan_____
Darren T. Kaplan (GA Bar No. 172670)
1230 Peachtree Street, Suite 2300
Atlanta, GA 30309
Tel:   (212) 999-7370
Fax:   (646) 390-7410

dkaplan@darrenkaplanlaw.com

**STUEVE SIEGEL HANSON LLP**
Norman E. Siegel, *pro hac vice forthcoming*
Steve Six, *pro hac vice forthcoming*
J. Austin Moore, *pro hac vice forthcoming*
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel:   (816) 714-7100
Fax:   (816) 714-7101
siegel@stuevesiegel.com
six@stuevesiegel.com
moore@stuevesiegel.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow, *pro hac vice forthcoming*
Jason H. Alperstein, *pro hac viceforthcoming*
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel:   (954) 525-4100
Fax:   (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei, *pro hac vice forthcoming*
Jeffrey D. Kaliel, *pro hac vice forthcoming*
Anna C. Haac, *pro hac vice forthcoming*
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Tel:   (202) 973-0900
Fax:   (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com
ahaac@tzlegal.com

*Counsel for Plaintiff and the Class*

**EXHIBIT A**

# Stueve · Siegel · Hanson

▲ LLP

**Stephen N. Six**
six@stuevesiegel.com

Phone: (816) 714-7190
Fax: (816) 714-7101

460 Nichols Road, Suite 200
Kansas City, Missouri 64112

January 5, 2015

**VIA CERTIFIED MAIL. RETURN RECEIPT REQUESTED**

National Arbitration Forum
P.O. Box 50191
Minneapolis, MN 55405

> **Re.:** *Lisa L. Flagg v. First Premier Bank and First International SRS*
> **NOTICE OF INTENTION TO ARBITRATE CONSUMER LOAN AGREEMENT CLAIM**

Ladies and Gentlemen:

Pursuant to the attached Loan Note and Disclosure Agreement ("Consumer Loan Agreement"), Plaintiff Lisa L. Flagg ("Plaintiff"), a Georgia consumer, wishes to arbitrate a consumer rights dispute with online payday lender First International SRS ("First International"), an entity engaged in the practice of making illegal and unenforceable loans, and First Premier Bank, which acted as an Originating Depositary Financial Institution ("ODFI") for the loan transactions with Plaintiff on behalf of First International. As a result, Plaintiff asserts claims against First International and First Premier for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), violations of the Georgia Payday Lending Act, O.C.G.A. §16-17-2, and for unjust enrichment.

Pursuant to Rule 12 of the Code of Procedure of the NAF, Plaintiff attaches as Exhibit A her Complaint / Initial Claim, which outlines the dispute, facts, and law supporting her Claim, the specific relief requested and the reasons supporting the relief, as well as the Affidavit of Steve Six.

Attached as Exhibit B, please find a copy of the Consumer Loan Agreement designating NAF as the arbitral forum. Plaintiff seeks forgiveness of all consumer debt, damages available at law, all attorneys' fees and expenses to date, and future attorneys' fees and expenses that will be incurred as a result of this arbitration.

Sincerely,

Steve Six

cc:     Lisa Flagg

## AFFIDAVIT OF STEVE SIX

I, Steve Six, declare upon personal knowledge and upon penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief:

1.    I am an attorney with the law firm Stueve Siegel Hanson LLP in Kansas City, Missouri, counsel for Claimant Lisa L. Flagg in this matter. I am a member in good standing of the Bars of the States of Kansas and Missouri and there are no pending disciplinary proceedings against me in any State or Federal court.

2.    I have personal knowledge of the facts stated herein and respectfully submit this affidavit in support of Claimant Lisa Flagg's Initial Claim.

3.    I assert that the information contained in the attached Complaint is accurate to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed this 5th day of January, 2015 in Kansas City, Missouri.

Steve Six

# EXHIBIT A

LISA L. FLAGG, on Behalf of
Herself and All Others Similarly
Situated,

        Plaintiff,

        vs.

FIRST INTERNATIONAL SRS,
FIRST PREMIER BANK, a South
Dakota State-Chartered Bank,

        Defendants.

Plaintiff Lisa L. Flagg ("Plaintiff" or "Flagg") individually and on behalf of

the Class described below, by her attorneys, makes the following allegations based

upon information and belief, except as to allegations specifically pertaining to

Plaintiff and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.    Plaintiff bring this class action against Defendants First International

SRS ("First Int'l") and First Premier Bank ("First Premier") (collectively

"Defendants") to recover damages and other relief available at law and in equity on

behalf of herself as well as on behalf of members of the class who have been

injured by Defendants' participation in a scheme to allow illegal online payday

1

lenders access to the nation's secure electronic payment transfer network known as the "ACH Network" or "Automated Clearing House" to collect unlawful debts in violation of 18 U.S.C. § 1962 and the law of numerous states, including Georgia.

2.    This is a civil action seeking monetary damages, restitution, and declaratory and injunctive relief from Defendants, arising from their participation in schemes to collect on "payday loans" in states that have made payday loans unlawful.

3.    Payday loans—small loans due in full on the borrower's next "payday"—have a long and sordid history.  For years, unscrupulous lenders have taken advantage of desperate borrowers who are unable to obtain funds anywhere else in order to make ends meet, by offering loans at usurious and unconscionable rates.  Payday lenders operate on the shadowy fringe of the mainstream financial system.

4.    At least thirteen states across the nation have either banned payday loans directly or effectively banned them by operation of an interest rate cap. Payday loans are illegal in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, and West Virginia, and the District of Columbia (the "banned states").

5.    Certain payday lenders, many of which are purportedly located on Indian reservations make use of the Internet to circumvent these prohibitions and

offer payday loans to borrowers residing in these states while ignoring the laws prohibiting those very loans (the "Illegal Payday Lenders"). These loans ("Illegal Payday Loans") feature interest rates of 400%, 500%, and higher.

6.     Illegal Payday Lenders' loan agreements with the borrowers often include an authorization allowing the illegal lender to "initiate" ACH transactions on the borrower's behalf. This authorization to "initiate" only allows a lender to *make a request* to an ACH Network member bank to be allowed entry to the ACH Network. The lender cannot "initiate" an entry into the secure ACH Network on its own.

7.     The rules and regulations governing the ACH Network require that an ACH Network member bank enter into a written agreement with merchants, like the Illegal Payday Lenders, who seek to initiate credits and debits electronically. This agreement describes in detail the scope of the relationship between the parties and has very specific requirements about what each party can and cannot do, as discussed further below

8.     Because the Illegal Payday Lenders cannot introduce credit and debit entries into the network on their own, Illegal Payday Lenders' ability to defy the law of thirteen states rests on the cooperation of financial institutions like First Premier that knowingly enter into these written contracts with Illegal Payday Lenders and then "originate" debits and credits from borrowers' bank accounts on

the ACH Network. These banks, known as Originating Depository Financial Institutions ("ODFIs") are the Illegal Payday Lenders' sole access point to the ACH Network—without this small group of banks willing to work with the Illegal Payday Lenders, the lenders' credit and debit entries cannot enter the secure ACH Network.

9. Indeed, it would be impossible for Illegal Payday Lenders to deposit payday loan proceeds or debit payday loan payments from customers' bank accounts in states where the loans are illegal and unenforceable without Defendant's willingness to allow the Illegal Payday Lenders to access the ACH Network.

10. First Premier, acting as an ODFI, actively participated in this unlawful scheme by granting Illegal Payday Lenders' requests to "initiate" ACH entries representing payday loan credits and debits to and from borrower checking accounts, and knowingly taking the affirmative steps to "originate" these illegal entries into the ACH Network, thereby enforcing debts First Premier knew to be unlawful.

11. First Premier knew that it was crediting and debiting borrowers' accounts for unlawful purposes because it was required to undertake extensive due diligence procedures on all merchants attempting to initiate credit or debit entries on the ACH Network before entering into contractual arrangements with them that

allowed access to the ACH Network. Indeed, ODFIs like First Premier are required by federal banking regulations and the rules of the ACH Network to know the identities of the entities for which they originate transactions and to assure themselves that such transactions do not violate state or federal law.

12.    First Premier knew that it was acting at the request of Illegal Payday Lenders and that the entries it originated on the ACH Network at the request of such Illegal Payday Lenders would credit or debit funds in states in which the Illegal Payday Lenders' loans were illegal and unenforceable.

13.    First Premier's illegal schemes with Illegal Payday Lenders have victimized Plaintiff and thousands of others. Unless enjoined, First Premier will continue to engage in these schemes and cause substantial injury to borrowers.

## PARTIES

14.    Plaintiff Lisa L. Flagg is a citizen and resident of Decatur, Georgia.

15.    Defendant First Premier is a South Dakota state-chartered bank with main offices at 601 South Minnesota Avenue, Sioux Falls, South Dakota.

16.    First International SRS. ("First Int'l") is an entity located in Sandy, Utah which advertises short-term payday loans on billboards and over the radio, using various trade names, across the United States. First Int'l engaged in the practice of making and did make illegal payday loans to persons residing in the banned states where such loans are prohibited outright. First Int'l is in the business

of making and collecting "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans that it makes and collects from borrowers are:

(A)  unenforceable because of state or federal laws against usury;

(B)  incurred in connection with the business of lending money at an usurious rate; and

(C)  the usurious rate was at least twice the enforceable rate.

## JURISDICTION AND VENUE

17.  Plaintiff brings this action pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1964(c) and (d).  This arbitral forum has jurisdiction over this action pursuant to the terms of the Consumer Loan Agreement between the Parties and the Federal Arbitration Act.

## BACKGROUND FACTS
### Payday Loans

18.  A payday loan is a short-term (typically a matter of weeks) high fee, closed-end loan, traditionally made to consumers to provide funds in anticipation of an upcoming paycheck.  A borrower obtaining an online payday must sign an ACH authorization agreement which purports to give the lender authority to electronically debit and credit loan transactions.  To use the ACH Network, however, the lender must find an ODFI Bank that is member of the ACH Network and willing to accept the lender's requests to "initiate" credit and debit entries on the loan.  The ODFI is supposed to engage in extensive due diligence procedures

prior to entering into an agreement with a merchant seeking to use the ACH Network to electronically process transactions.

19. Only after the ODFI bank agrees that the merchant and its initiated entries are in full compliance with the ACH Network rules and state and federal law may it "originate" the entries into the secure ACH Network where the funds are electronically credited to or debited from the borrower's bank account. The ODFI banks serve as the bridge that connects the lender to the ACH Network and allows the lender, working through its specific ODFI bank(s), electronically to debit the borrower's deposit account for the loan payment amounts and associated fees. Without an ODFI bank's active participation to grant the lender's request to "initiate" debit entries and "originate" those entries into the ACH Network—the lender cannot reach the borrowers' account.

20. Payday loans target the most vulnerable and desperate of borrowers, who might not qualify for a conventional unsecured loan or who are in such desperate need of cash that they cannot wait for the formal approval process that a conventional unsecured loan requires.

21. Payday loans feature exorbitant interest rates (sometimes misleadingly referred to as "fees") and require "balloon" repayments shortly after the loan is made.

22.     The lenders engage in deceptive practices to ensure that the loan is never paid off.   Specifically, the lenders represent to borrowers that the total payment for satisfying the payday loan is the sum of the principal borrowed plus a one-time stated finance charge.   In reality, the lenders continuously debit purported "finance" charges from borrowers and do not apply those funds to the principal of the loan.   It is the rare instance that a borrower is actually debited in accordance with the already-astronomical terms stated in the payday loan agreement.

23.     To ensure the loans are never paid off (or, at least, last longer than their stated terms), payday lenders routinely "roll over" the borrower's loan balance without first securing affirmative consent to do so.   Over 75 percent of payday loan volume is the result of "churn"—borrowers having to take out additional loans to pay off the original debt.   For this reason, borrowers are frequently charged substantially higher interest rates than the terms stated in the agreement.

24.     For these and other reasons, Georgia, twelve other states and the District of Columbia have outlawed payday loans.

25.     In Georgia, a transaction is civilly usurious when it imposes an annual interest rate exceeding 16% per annum for loans with a principal amount of less than $3,000.   O.C.G.A.  §7-4-2.     By statute,  a usurious loan  is  void  and unenforceable, and the borrower is relieved from the obligation to repay both the

principal and any accrued interest. Further, loans with an interest rate exceeding 5% per month are criminally usurious in Georgia under O.C.G.A. §7-4-18.

26. Illegal Payday Lenders, while not permitted to operate in the banned states and the District of Columbia, have simply moved to the Internet in order to solicit desperate borrowers in the banned states into illegal loans using an online application process. This scheme could not have been accomplished without the complicity of ODFIs like First Premier who provide Illegal Payday Lenders with access to the ACH Network.

## The ACH Network

27. The ACH Network is a processing system in which financial institutions accumulate ACH transactions throughout the day for later batch processing. Instead of using paper to transmit transaction information, such as with checks, ACH Network transactions are transmitted electronically, allowing for faster processing times and cost savings.

28. The rules and regulations that govern the ACH network are established by NACHA (formerly the National Automated Clearing House Association) and the Federal Reserve. NACHA manages the development, administration, and governance of the ACH Network.

29. The *NACHA Operating Rules* are an extensive set of rules and regulations that govern and provide ACH Network participants with the operational

framework for the ACH Network. The *NACHA Operating Guidelines* provide guidance on implementing the Operating Rules (the NACHA Operating Rules & Guidelines collectively referred to herein as "NACHA Rules"). According to its introduction, the NACHA Rules "serve[] as the definitive source of information governing the exchange and settlement of electronic fund transfers through the ACH Network."

30. An ACH transaction takes place in many steps and, under the NACHA Rules, entries may be rejected at any point if they are not in compliance with the NACHA Rules or are illegal under federal or state law. The first step is having a merchant, in this case the Illegal Payday Lenders, receive authorization from a party (in this case the borrower) to initiate credits or debits on the ACH Network— typically styled as an "Authorization to Initiate ACH Transactions." This authorization allows the merchant to take the next step in the process, which is to find an ODFI bank participating in the ACH Network that is willing to enter into a separate written contract with the merchant to "originate" the lender's request to "initiate" credit or debit entries into the network. Although it is the party "initiating" entries, merchants like Illegal Payday Lenders are known as "Originators" under the NACHA Rules (and are referred to as "Originators" herein) even though the ODFI banks are the parties tasked with "originating" the credit or debit entries "initiated" by the Originators.

31. Under the NACHA Rules, Originators like the Illegal Payday Lenders do not have the ability to introduce a debit entry into the ACH Network on their own. Originators can only make a request to "initiate" a debit entry to the specific ACH member ODFI bank or banks with which it has entered into a contractual relationship to grant them access to the ACH Network. Because ODFI banks are tasked with this important "gatekeeping" function, however, the ODFI banks are required to fully audit and vet the Originator's business to ensure it complies with NACHA Rules, and state and federal laws before entering into a contractual arrangement with that Originator.

32. If the ODFI is satisfied that the Originator (here the Illegal Payday Lender) is in compliance, it may, pursuant to its agreement with the Originator, transmit ("originate") the ACH debit or credit to a pass-through clearing house known as an "ACH Operator." Under the NACHA Rules, the ACH Operator processes entries between the ODFI and the accountholder's bank, known as the Receiving Depository Financial Institution ("RDFI"). The RDFI is also a member of the ACH Network, and is the entity that actually makes the credit or debit on its customer's checking or savings account.

33. Also active on the ACH Network are "Third Party Service Providers" which are entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing

11

of ACH entries. A "Third-Party Sender" is a type of Third Party Service Provider that has an ACH agreement with the Originator, and the ODFI's ACH agreement is with the Third-Party Sender and not the Originator. An ODFI's obligations are the same whether it originates for an Originator directly, or for a Third-Party Sender acting on behalf of an Originator.

34.     The NACHA Rules specifically require all parties involved in the processing of ACH transactions to adhere to all state and federal laws in the United States. These requirements are meant to keep illicit and unlawful transactions out of the ACH Network.

35.     The NACHA Rules require all participants in the ACH Network to perform risk-based due diligence and monitoring for unlawful transactions and merchants. The following Policy Statement was adopted by the NACHA Board of Directors on August 22, 2002:

> Fraud and various forms of financial abuse have found their way into every facet of the U.S. payment systems. The NACHA Board believes that the Automated Clearing House Network must maintain the highest standards of fraud prevention to retain the integrity of the payment mechanism and the trust and confidence of its users. Therefore, the NACHA Board resolves and strongly urges that all participants implement adequate control systems to detect and prevent fraud and abusive financial transactions.

36.     The NACHA Rules apply to and govern every member that chooses to participate in the ACH Network, and are admittedly structured around the

significant obligations of ODFIs and RDFIs: "The [NACHA] *Rules* are organized around the types of participants in the ACH Network and acknowledge the major roles played by originating and receiving financial institutions [and] therefore dedicate[e] large sections to each of these roles. **The [NACHA] Rules explicitly recognize that originating financial institutions are the entry points into the ACH Network for corporate users and Third Parties, and that these financial institutions are responsible for those parties' compliance with the [NACHA] Rules.**" NACHA 2013 Operating Rules, Introduction. The specific responsibilities of ODFIs are discussed in detail below.

### ODFIs Have Special Duties under NACHA Operating Rules and Guidelines

37. NACHA characterizes ODFIs as "the gatekeepers of the ACH Network." As the party that enables an Originator – such as an Illegal Payday Lender – to initiate debit entries on the ACH Network, NACHA Operating Rules require an ODFI to enter into an Origination Agreement with each Originator for which it will originate entries on the ACH Network or have an arrangement with a Third-Party Sender that has such an Origination Agreement. NACHA 2013 Operating Rules, Section 2.2, Subsection 2.2.1.

38. Under the NACHA Rules, "[a]n ODFI is responsible for all Entries originated through the ODFI whether by an Originator or through a Third-Party

Sender . . . [a]n ODFI is responsible for its Originators' and Third-Party Senders' compliance with these Rules." NACHA 2013 Operating Rules, Section 2.1.

39.     NACHA Rules require all ODFIs to conduct a risk assessment of their ACH activities, including, *inter alia*, "assessing the nature of risks associated with ACH activity; performing appropriate know-your-customer due diligence; and having adequate management, information and reporting systems to monitor and mitigate risk." *See* NACHA 2013 Operating Guidelines, Chapter 4 General Rules, p. OG21.

40.     The NACHA Operating Guidelines caution that "ODFIs that choose to originate ACH entries . . . should be aware that both they and their Originators are subject to the NACHA Operating Rules and applicable U.S. law when transmitting these entries."     NACHA 2013 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, p. OG17.

41.     Section 2.4 of the NACHA Rules provides for "General Warranties and Liabilities of Originating Depository Financial Institutions" and holds that when an ODFI transmits an ACH entry, it is warranting to each RDFI and ACH Operator that, *inter alia*, "the entry has been properly authorized by the Originator and the Receiver in accordance with these Rules." NACHA 2013 Operating Rules Section 2.4, Subsection 2.4.1.1 (a), p. OR7.

42.     With regard to debit entries from consumer accounts (such as those that represent loan repayments to Illegal Payday Lenders), ***an authorization that is "otherwise invalid under applicable Legal Requirements does not satisfy the requirements" of an "authorization" under the NACHA Rules.*** NACHA 2013 Operating Rules Section 2.3, Subsection 2.3.2.3 (b), p. OR6. (emphasis added)

43.     Further, Subsection 2.2.1.1-2 of the NACHA Rules requires ODFIs to enter into a written agreement with every Third-Party Sender or Originator (or merchant) for whom they originate ACH entries. That agreement is to include an "agree[ment] not to originate Entries that violate the laws of the United States;" a "restriction on the types of entries that may be originated" and must include "the right of the ODFI to audit the Originator's or Third-Party Sender's compliance with the Origination Agreement and these Rules."

44.     ODFIs also have clear duties to "know your customer" and the NACHA Operating Rules make clear that they are intended to reflect that principle. NACHA 2012 Operating Guidelines, Chapter 3 OFAC Requirements and Obligations, OG13.

45.     On March 14, 2013, NACHA issued an advisory in response to certain negative press reports about collusion of ACH members with payday lenders. In the release, NACHA reiterated the important policing duties of ODFIs: "[E]ach ODFI is responsible for the valid authorization of every ACH debit processed in its

name . . . In the case of authorizations from consumers, the NACHA Rules are explicit that, among other things, the authorization must 'be readily identifiable as an authorization'; and 'have clear and readily understandable terms.' *If a purported authorization is invalid under applicable law, it does not meet this standard*." (Emphasis added).

46.    NACHA went on to say:

> Because of these obligations, as well as associated reputational and other risks, the Federal banking agencies advise that ODFIs should, among other things, (i) exercise appropriate risk-based diligence when bringing on new Originators and Third-Party Senders and (ii) perform appropriate monitoring to determine whether excessive returns or other suspicious patterns of activity warrant further review or more aggressive action. For example, in 2006 the Office of the Comptroller of the Currency (OCC) released its risk management guidance for ACH activities by national banks, OCC Bulletin 2006-39, in which it cautioned national banks acting as ODFIs to perform a risk-based evaluation of new Originators, including their historic patterns of unauthorized returns and whether they are engaged in legitimate business activities.

47.    The NACHA Operations Bulletin instructed ACH participants as follows: "ACH participants are strongly encouraged to establish business practices that ensure that ACH transactions do not facilitate illegal activity."

48.    In August 2013, NACHA sent a letter to banks warning them that authorizing access to customer accounts for Illegal Payday Lenders or their Third-Party Senders could violate NACHA rules. In the letter, NACHA stated that under

its rules, "purported authorizations to pay illegal loans that are unenforceable under applicable state law" are not valid.

### ODFIs Have Additional Duties With Regard to Debit Authorizations Purportedly Made Via the Internet under NACHA Operating Rules and Guidelines

49.     Each entry into the ACH Network is coded pursuant to a NACHA entry code that identifies the type of activity the entry represents.  The ACH Network has at least 23 standard entry codes, and NACHA has identified two specific entry codes that are used by high risk Originators such as Illegal Payday Lenders: "ACH WEB" and "ACH TEL".

50.     For example, under the NACHA Rules, a debit entry to a consumer account originated based on an authorization that is communicated, other than by an oral communication, from the Receiver to the Originator via the Internet is coded as a "WEB" entry on the ACH transaction record. *See, e.g.*, 2013 NACHA Operating Rules Subsection 2.5.17.

51.     The NACHA Operating Rules require that, "[a]n ODFI must perform, or ensure that its Originator or Third-Party Sender performs, the requirements of Subsection 2.5.17.2 (Authorization of WEB Entries) and Subsection 2.5.17.3 (WEB Annual Audit) [see] below before permitting an Originator or Third-Party Sender to initiate a WEB Entry."

52.     With regard to WEB entries, Subsection 2.5.17.4 of the NACHA Operating Rules provides:

> In addition to the other warranties contained within these Rules, an ODFI originating a WEB Entry warrants to each RDFI and ACH Operator that:
>
> (a) *Fraud Detection Systems.* The Originator has established and implemented a commercially reasonable fraudulent transaction detection system to screen the WEB Entry.
>
> (b) *Verification of Receiver's Identity.* The Originator has established and implemented commercially reasonable methods of authentication to verify the identity of the Receiver of the WEB Entry.
>
> (c) *Verification of Routing Numbers.* The Originator has established and implemented commercially reasonable procedures to verify that the routing number used in the WEB Entry is valid.

53.     In addition to the NACHA Operating Rules, with regard to Internet initiated entries, NACHA recommends the following as sound business practices in Chapter 48 *Internet Initiated /Mobile Entries (WEB)* of its Operating Guidelines:

## RESPONSIBILITIES OF ODFIs

### Agreements with Originators

Each ODFI that chooses to transmit WEB entries on behalf of its Originators should make modifications to its agreements with its Originators to address the origination of these entries. These modifications should address:

- the allocation of liability between the Originator and ODFI for WEB transactions, and

- any specific processing obligations relating to such transactions.

In addition, these agreements should address the procedures, practices, and systems Originators are using to comply with their obligations under the *NACHA Operating Rules* governing WEB entries. For example, the agreement may need to address the authentication methods and the fraudulent transaction detection systems the Originators are using for WEB entry transactions. ODFIs may also want to see proof of the Originator's annual data security audit prior to or as a condition of transmitting WEB entries for the Originator.

*****

**Warranties and Liabilities**

In addition to all other ODFI warranties contained within the NACHA Operating Rules, each ODFI that chooses to transmit WEB entries on behalf of its Originators also warrants that:

- Each Originator for which the ODFI transmits WEB entries has employed a commercially reasonable fraudulent transaction detection system to screen the entries;

- Each Originator of WEB entries has employed commercially reasonable methods of authentication to verify the identity of the Receiver;

- Each Originator has taken commercially reasonable steps to verify that routing numbers are valid; and

- Each Originator has conducted an annual data security audit to ensure that the financial information that the Originator obtains from Receivers is protected by security practices that include adequate levels of:

  - physical security to protect against theft, tampering, or damage,

  - personnel and access controls to protect against unauthorized access and use, and

  - network security to ensure secure capture, transmission, distribution, and storage until destruction of financial information.

ODFIs must know their Originators and monitor WEB entries because there are additional risk factors to consider with this type of transaction stemming from the inherent risk of transactions that are conducted in an Internet and non face-toface [sic] environment.

All of these additional warranties should be explicitly addressed in ODFI agreements with Originators because there is a commercially reasonable standard that applies to several of the warranties, ODFIs need to be aware of what procedures, practices, and systems their Originators have deployed to meet these requirements.

## The OCC Has Issued Guidance to All Banks On Managing the Risks of ACH Activity

54.     The Office of the Comptroller of the Currency ("OCC") supervises national banks such as First Premier.

55.     On September 1, 2006, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity, explaining that "[n]ational banks may be exposed to a variety of risks when originating, receiving, or processing ACH transactions, or outsourcing these activities to a third party."

56.     The guidance advised:

### High-Risk Activities

Banks that engage in ACH transactions with high-risk originators or that involve third-party senders face increased reputation, credit, transaction, and compliance risks. High-risk originators include companies engaged in potentially illegal activities or that have an unusually high volume of unauthorized returns.

Before a bank engages in high-risk ACH activities, the board of directors should consider carefully the risks associated with these activities, particularly the increased reputation, compliance, transaction, and credit risks. The board should provide clear direction to management on whether, or to what extent, the bank

may engage in such ACH activities. Some banks have established policies prohibiting transactions with certain high-risk originators and third-party senders.

57. In a footnote to the guidance, the OCC made the risk to banks even clearer, "*[r]isks may include the risk of legal liability* or damage to an institution's reputation *when originators or third-party senders facilitate or engage in activities that violate criminal laws*." (Emphasis added)

58. On April 24, 2008, the OCC provided guidance for national banks and examiners on managing the risks of ACH activity initiated by Third-Party Processors, cautioning that:

> Banks should also consider carefully the legal, reputation, and other risks presented by relationships with processors including risks associated with customer complaints, returned items, and potential unfair or deceptive practices. *Banks that do not have the appropriate controls to address the risks in these relationships may be viewed as facilitating a processor's or its merchant client's fraud or other unlawful activity*. (Emphasis added)

59. The guidance reminded banks that they:

> . . . must implement a due diligence and underwriting policy that, among other things, requires an initial background check of the processor and its underlying merchants to support the validity of the processor's and merchants' businesses, their creditworthiness, and business practices.

*******

> By implementing the appropriate controls over processors and their merchant clients, a bank should be able to identify those processors that process for fraudulent telemarketers or other unscrupulous merchants and to ensure that the bank is not facilitating these transactions. In the event a bank identifies fraudulent or other

improper activity with a processor or a specific merchant client of the processor, the bank should take immediate steps to address the problem, including filing a Suspicious Activity Report when appropriate, terminating the bank's relationship with the processor, or requiring the processor to cease processing for that specific merchant.

60.    The guidance concludes that:

The OCC supports national banks' participation in payment systems to serve the needs of legitimate processors and the customers of such processors and to diversify sources of revenue. However, to limit potential risk to banks and consumers, banks should ensure implementation of risk management programs that include appropriate oversight and controls commensurate with the risk and complexity of the activities. At a minimum, bank programs should verify the legitimacy of the processor's business operations, assess the bank's risk level, and monitor processor relationships for activity indicative of fraud.

## The FDIC Has Issued Guidance to State-Chartered Banks that Enter Into Payment Processor Relationships with Third Parties

86.    The Federal Deposit Insurance Corporation ("FDIC") regulates state-chartered banks and its pronouncements and guidance are closely monitored even by financial institutions that are regulated by other federal regulators.

87.    On February 25, 2005, the FDIC issued guidance regarding payday lending and cautioned that such lending raises "significant risks" for banks, particularly when the payday lenders initiate through Third-Party Senders. The FDIC guidance makes clear that:

The use of third parties in no way diminishes the responsibility of the board of directors and management to ensure that the third-party activity is conducted in a safe and sound manner and in compliance

with policies and applicable laws. Appropriate corrective actions, including enforcement actions, may be pursued for deficiencies related to a third-party relationship that pose concerns about either safety and [sic] soundness or the adequacy of protection afforded to consumers.

88. On June 6, 2008, the FDIC issued additional "Guidance for Managing Third-Party Risk" which began by noting that:

An institution's board of directors and senior management are ultimately responsible for managing activities conducted through third-party relationships, and identifying and controlling the risks arising from such relationships, to the same extent as if the activity were handled within the institution.

89. Among the risks to banks the FDIC identified in its June 6, 2008 "Guidance for Managing Third-Party Risk" was:

Compliance risk. Compliance risk is the risk arising from violations of laws, rules, or regulations, or from noncompliance with internal policies or procedures or with the institution's business standards. This risk exists when the products or activities of a third party are not consistent with governing laws, rules, regulations, policies, or ethical standards. For example, some third parties may engage in product marketing practices that are deceptive in violation of Section 5 of the Federal Trade Commission Act . . . Compliance risk is exacerbated when an institution has inadequate oversight, monitoring or audit functions.

90. Accordingly, the FDIC advises banks to engage in "Due Diligence in Selecting a Third Party":

Following an assessment of risks and a decision to proceed with a plan to establish a third-party relationship, management must select a qualified entity to implement the activity or program. The due diligence process provides management with the information needed to address qualitative and quantitative aspects of potential third parties

to determine if a relationship would help achieve the financial institution's strategic and financial goals and mitigate identified risks. Not only should due diligence be performed prior to selecting a third party, but it should also be performed periodically during the course of the relationship, particularly when considering a renewal of a contract.

******

Comprehensive due diligence involves a review of all available information about a potential third party, focusing on the entity's financial condition, its specific relevant experience, its knowledge of applicable laws and regulations, its reputation, and the scope and effectiveness of its operations and controls.

91.    On January 31, 2012, the FDIC issued revised guidance describing potential risks associated with relationships with third-party entities that process payments for telemarketers, online businesses, and other merchants. In a footnote to the guidance, the FDIC provided, "[e]xamples of telemarketing, online businesses, and other merchants that may have a higher incidence of consumer fraud or potentially illegal activities or may otherwise pose elevated risk" which included "payday or subprime loans."

92.    The FDIC advised banks that:

. . .   payment processors that deal with telemarketing and online merchants may have a higher risk profile because such entities have tended to display a higher incidence of consumer fraud or potentially illegal activities than some other businesses. Given this variability of risk, payment processors must have effective processes for verifying their merchant clients' identities and reviewing their business practices. Payment processors that do not have such processes can pose elevated money laundering and fraud risk for financial

institutions, as well as legal, reputational, and compliance risks if consumers are harmed.

93.     The FDIC made clear that banks faced potential liability if they failed to adequately manage their relationships with payment processors:

> Deposit relationships with payment processors expose financial institutions to risks not customarily present in relationships with other commercial customers. These include increased operational, strategic, credit, compliance, and transaction risks. In addition, financial institutions should consider the potential for legal, reputational, and other risks, including risks associated with a high or increasing number of customer complaints and returned items, and the potential for claims of unfair or deceptive practices. ***Financial institutions that fail to adequately manage these relationships may be viewed as facilitating a payment processor's or merchant client's fraudulent or unlawful activity and, thus, may be liable for such acts or practices.*** In such cases, the financial institution and responsible individuals have been subject to a variety of enforcement and other actions. ***Financial institutions must recognize and understand the businesses and customers with which they have relationships and the liability risk for facilitating or aiding and abetting consumer unfairness or deception*** under Section 5 of the Federal Trade Commission Act. (Emphasis added).

94.     On February 15, 2013, M. Anthony Lowe, Regional Director of the FDIC's Chicago Regional Office wrote to an Ohio-chartered bank following a Compliance and Risk Management visitation of that bank after the FDIC became aware that the bank had been processing transactions on behalf of payday lenders. The letter set forth the FDIC's position with regard to banks' processing of such transactions on behalf of payday lenders:

> The focus of our visitation was on the risk associated with this relationship (with a payday lender), compliance with consumer

protection laws and regulations, and the effectiveness of Board and senior management due diligence and oversight of this relationship and the corresponding payday lending-related activities. It is our view that payday loans are costly, and offer limited utility for consumers, as compared to traditional loan products. Furthermore, the **[Redacted]** relationship carries a high degree of risk to the institution, including third-party, reputational, compliance, and legal risk, which may expose the bank to individual and class actions by borrowers and local regulatory authorities. Consequently, we have generally found that activities related to payday lending are unacceptable for an insured depository institution.

### First Premier Knew the Illegal Payday Lenders Were Engaged In Unlawful Activities

95.     At the time First Premier originated the entries on the ACH Network referenced herein, it knew the identity of First Int'l, it knew First Int'l was engaged in the business of making payday loans, and it knew First Int'l was engaged in the business of making payday loans in states where payday lending was unlawful.

96.     According to the NACHA Rules, NACHA represents more than 10,000 financial institutions via 17 regional payments associations and direct membership.     Approximately 99% of these banking institutions have never originated entries on the ACH Network at the request of an unlicensed, online payday lender like First Int'l.

97.     In contrast, First Premier was one of the most active originators of ACH WEB and ACH TEL entries on the ACH Network for high risk originators such as online payday lenders.     First Premier originated entries on the ACH Network at the request of payday lenders like First Int'l because it could charge

payday lenders higher fees to originate high-risk payday loans entries than are customarily paid for originations on the ACH Network by legitimate originators. First Premier charged these higher fees because it knew the transactions it was originating were illegal.

98. The higher origination fees charged to the payday lenders reflected the calculated risk First Premier took knowingly to assist "high-risk" originators like First Int'l in violating the laws of the banned states, the NACHA Rules, and OCC and FDIC guidelines. The overwhelming majority of ODFIs on the ACH Network refused to originate entries on behalf of these same Illegal Payday Lenders.

99. Without direct, unilateral access to borrowers' bank accounts provided by ODFI banks willing to abandon their "gatekeeper" responsibilities to guard the secure ACH Network, the Illegal Payday Lenders like First Int'l would need borrowers to take an affirmative step such as writing and mailing a check for each loan repayment. Borrowers that find lenders' demands for repayment to be inconsistent with their respective understandings of their loan agreements would have an opportunity—before money is unilaterally taken from their bank accounts by the ODFI banks "originating" the debit entries requested by the lenders—to question, reject, or dispute the demand for payment. The FTC has warned

consumers about this practice and sued certain payday lenders for engaging in similar conduct.[1]

100. Characteristics of Illegal Payday Lender transactions themselves also notified ODFIs of unlawful activity.

101. Whether ODFIs contract with Illegal Payday Lenders or their Third-Party Senders, ACH debits originated at the request of Illegal Payday Lenders inevitably raise "red flags" to ODFIs which alert them to the fact that potential unlawful activity is occurring.

102. Chief among these "red flags" are high return rates on ACH debit transactions. An ACH debit transaction may be returned for numerous reasons including, *inter alia*, the account to be debited having insufficient funds or the account owner claiming the debit was not authorized.

103. ACH debits originated at the request of the Illegal Payday Lenders far exceed the return rate for all electronic payments of less than 1%. Although high-return rates alerted ODFIs of potential illegal activity, First Premier ignored these warnings—not only because it already knew the business of the Illegal Payday Lenders through its required due diligence obligations, but also because the ODFIs

---

[1] <https://www.consumer.ftc.gov/articles/0249-online-payday-loans> (last visited on Jan. 5, 2015).

charge fees on every return payment made by the Originator. Thus, they can potentially reap twice the profit in fees associated with unauthorized payments.[2]

104. In addition to NACHA Rules discussing the importance of investigating high return rates (*see* 2013 NACHA Rules, subsection 2.17.2.2 "ODFI Reduction of Return Rate"), the banking industry has been informed that high rates of returned transactions – regardless of the specific reason for the return – indicate suspicious activity. As noted by the Financial Crimes Enforcement Network of the U.S. Department of the Treasury ("FinCEN"):

> *Fraud*: High numbers of consumer complaints about Payment Processors and/or merchant clients, and particularly **high numbers of returns or chargebacks (aggregate or otherwise)**, suggest that the originating merchant may be engaged in unfair or deceptive practices or fraud, including using consumers' account information to create unauthorized RCCs or ACH debits.

*FinCEN Advisory: Risk Associated with Third-Party Payment Processors*, FIN-2012-A010 (October 22, 2012) (emphasis added).

105. First Premier knowingly ignored the nature of the Illegal Payday Lenders' business, ignored their usage of entry codes that are known to be used by

---

[2] For example, between 2003 and 2006, Wachovia Bank collected millions of dollars in origination fees by debiting funds for fraudulent telemarketers. The OCC asserted that some of the bank's officials knew about the deceptive telemarketing practices but failed to take quick action to resolve the problem because high-return rates alone netted Wachovia $1.45 million in return item fees. Ultimately Wachovia agreed to pay over $150 million in restitution to defrauded consumers, a $10 million civil money penalty and $8.9 million in contributions to consumer education.

high risk Originators such as Illegal Payday Lenders: ACH WEB and ACH TEL, and ignored excessively high-return rates and charge backs in order to turn extra profit.

## FACTS AS TO PLAINTIFF LISA FLAGG

106. On or about August 9, 2012, Plaintiff received a payday loan from First Int'l in the amount of $250.00. The finance charge on the loan was $85.00. The entirety of the interest plus principal, which equaled $335.00, was scheduled to be paid in 22 days. Thus, the nominal annual interest rate on the loan was 899.46%.

107. Even if timely paid off, the loan automatically renews unless the borrower affirmatively declines the renewal option at least three business days prior to the loan due date.

108. As a result, on or about September 14, 2012, and October 12, 2012, First Int'l initiated debit transactions in the amount of $335.00 from Plaintiff Flagg's checking account in Georgia through the ACH Network. The ODFI originating each of these transactions was Defendant First Premier.

109. First Premier derived a benefit through the receipt of fees for its origination of debit entries on the ACH Network initiated by First Int'l (or Third-Party Senders acting on their behalf) and received by Plaintiff.

# CLASS ACTION ALLEGATIONS

110. <u>Description of the Class and Sub-Class</u>: Plaintiff brings this class action on behalf of herself and a Class and Sub-Class defined as follows:

 i.   All natural persons within the states of Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia whose accounts were debited via an ACH entry originated by First Premier as an ODFI on behalf of First Int'l in repayment of a loan which was illegal under the law of their respective state at the time of the debit (the "Class").

 ii.   All natural persons within the state of Georgia whose accounts were debited via an ACH entry originated by either First Premier as an ODFI on behalf of First Int'l in repayment of a loan which was illegal under Georgia law at the time of the debit (the "Sub-Class").

111. Excluded from the Class and Sub-Class are Defendants' officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns. Also excluded from the Class and Sub-Class is any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

112. <u>Numerosity</u>: The proposed Class and Sub-Class are so numerous that individual joinder of all members is impracticable.

113. <u>Common Questions of Law and Fact Predominate</u>: There are many questions of law and fact common to Plaintiff and the Class and Sub-Class, and those questions substantially predominate over any questions that may affect

individual Class and Sub-Class members. Common questions of fact and law include (a) whether payday loans are usurious and unenforceable under state or federal law; (b) whether debts owed to payday lenders are incurred in connection with the business of lending money at an usurious rate; (c) whether the usurious rate was at least twice the enforceable rate under the law of the states in which class members reside; (d) whether First Premier's collection of the illegal or unenforceable debt was made with actual or constructive knowledge of the illegality of the loans; (e) whether First Premier's collection of the illegal debt was the proximate cause of the Class and Sub-Class's injuries; (f) whether the Class and Sub-Class suffered an injury to property by the debiting of their accounts by First Premier; and (g) should the running of the statute of limitations for the Class and Sub-Class's claims be equitably tolled.

114. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Class and Sub-Class. Plaintiff and all members of the Class and Sub-Class have been similarly affected by the actions of First Premier.

115. <u>Adequacy of Representation</u>: Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class. Plaintiff has retained counsel with substantial experience in prosecuting complex and class action litigation. Plaintiff and her counsel are committed to vigorously prosecuting this

action on behalf of the Class and Sub-Class, and have the financial resources to do so.

116. <u>Superiority of Class Action</u>: Plaintiff and the members of the Class and Sub-Class suffered, and will continue to suffer, harm as a result of First Premier's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the present controversy. Individual joinder of all members of the Class and Sub-Class is impractical. Even if individual class members had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed. Individual litigation magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by First Premier's common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all class members' claims in a single forum. The conduct of this action as a class action conserves the resources of the parties and of the judicial system, and protects the rights of the class members.

**FIRST CLAIM FOR RELIEF**
**Violation of 18 U.S.C. § 1962(c) an by Defendants**
**(On behalf of the Class and Sub-Class)**

117. Plaintiff incorporates by reference the preceding paragraphs.

118.   First Premier and First Int's are "persons" as defined by 18 U.S.C. § 1961(3).

119.   The financial entity participants in the ACH Network are comprised of the following:

    a.   "Originators" which include any party that "initiates" entries into the ACH Network pursuant to an Origination Agreement with an ODFI or Third-Party Sender acting on behalf of an ODFI, including First Int'l;

    b.   Third Party Service Providers" which include entities other than the Originator, ODFI, or RDFI that perform any function on behalf of the Originator, ODFI, or RDFI with respect to the processing of ACH entries.   A "Third-Party Sender" is a type of Third-Party Service Provider that enters into an agreement with an Originator to "initiate" entries on its behalf and then enters into an Origination Agreement with an ODFI to "originate" the entries initiated by the Third-Party Sender on behalf of the Originator;

    c.   "ODFIs" which include all financial institutions participating in the ACH Network that originate ACH entries pursuant to an Origination Agreement with Originators or Third-Party Senders and that agree to abide by the NACHA Rules, including First Premier.

d. "ACH Operators" which include two central clearing facilities, the Federal Reserve Banks and Electronic Payments Network (EPN), that receive entries from ODFIs and process the entries to the appropriate RDFI; and

e. "RDFIs" which include all depository financial institutions participating in the ACH Network that receive ACH transaction instructions from ODFIs through the ACH Operator and credit or debit funds to or from its customers' accounts and that are qualified to receive ACH entries and agree to abide by the NACHA Rules.

120. These financial entity participants in the ACH Network constitute an "association-in-fact" enterprise as those terms are used in 18 U.S.C. § 1961(4) (the "ACH Network Enterprise") in that:

a. Participants in the ACH Network Enterprise share the common lawful and legitimate purpose of facilitating batch processing of electronic payments (credit and debit transactions) for and between participating depository financial institutions;

b. To achieve this common purpose, participants in the ACH Network Enterprise preserve close business relationships and maintain established and defined roles within the enterprise;

c. The ACH Network Enterprise has been in existence for many years, is still ongoing, and has longevity sufficient to permit the participants to achieve their common purpose.

121. The ACH Network Enterprise is an enterprise engaged in, and whose activities, including daily volume batch processing of electronic payments across the United States, affect interstate commerce. First Premier is associated with the ACH Network Enterprise through its role as an ODFI within the ACH Network Enterprise. First Int'l serves as an Originator in the ACH Network.

122. First Premier, as an ODFI, plays a distinct role in the operation, management, and control of the ACH Network Enterprise. Under the NACHA Operating Rules, First Premier serves the critical function of "gatekeeper of the ACH Network" and is responsible for all entries originated through First Premier, whether initiated by an Originator, or by a Third-Party Service Provider acting on the Originator's behalf. First Premier has decision-making authority within the ACH Network Enterprise regarding which Originators and entries to accept into or reject from the ACH Network.

123. In order to initiate debit entries from borrower checking accounts on the ACH Network, Illegal Payday Lenders, or Third-Party Senders acting on their behalf, must enter into an Origination Agreement with an ODFI, such as First Premier, and the ODFI must originate the ACH debit. Pursuant to NACHA Rules,

when an ODFI originates an ACH entry, it is warranting to each RDFI and ACH Operator that the entry has been properly authorized meaning that it is, *inter alia*, compliant with the NACHA Rules and state and federal laws.

124. While First Premier shares in the common purpose of the ACH Network and uses the ACH Network to originate lawful and legitimate transactions, First Premier also uses its role within the ACH Network Enterprise to conduct unlawful payday loan debt collection by granting Illegal Payday Lenders access to the ACH Network and "originating" debit entries from the bank accounts of persons residing in states in which payday lending is illegal "initiated" by First Int'l (or Third-Party Senders working on its behalf) for the purpose of repaying usurious and illegal loans. The loans made by First Int'l are "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a. unenforceable because of state or federal laws against usury;

    b. incurred in connection with the business of lending money at an usurious rate; and

    c. the usurious rate was at least twice the enforceable rate.

125. First Premier, in its role as an ODFI in the ACH Network Enterprise, originated debit entries on the ACH Network at the request of First Int'l (or Third-Party Senders acting on behalf of First Int'l) that First Premier knew routinely violate state law, the NACHA Rules and FDIC and OCC guidelines.

126. Pursuant to the fraudulent scheme, First Premier participated in the collection of unlawful debts in that:

a. First Int'l, or Third-party Senders acting on its behalf, "initiated" debit entries that were subsequently "originated" into the ACH Network by First Premier whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b. First Premier originated ACH entries by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c. First Premier knew that First Int'l was a payday lender and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states at the request of First Int'l in violation of 18 U.S.C. §1962(c).

127. Accordingly, First Premier has used its gatekeeping role as an ODFI in the ACH Network to directly and indirectly conduct and participate in the conduct

of the affairs of the ACH Network Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

128. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier on b healf of First Int'l and such injury was reasonably foreseeable.

## SECOND CLAIM FOR RELIEF
### Violation of 18 U.S.C. § 1962(d) by Defendants
### (On behalf of the Class and Sub-Class)

129. Plaintiff incorporates by reference the preceding paragraphs.

130. First Premier and First Int'l, or a Third-Party Sender acting on its behalf, reached an agreement to use their respective roles within the ACH Network Enterprise to facilitate payday loans to borrowers residing in states that banned the practice and collect usurious interest rates in violation of state law. Their endeavor, if completed, would constitute the collection of "unlawful debts" under 18 U.S.C. § 1961(6) in that the loans are:

    a.    unenforceable because of state or federal laws against usury;

    b.    incurred in connection with the business of lending money at an usurious rate; and

    c.    the usurious rate was at least twice the enforceable rate.

131. In furtherance of their agreement, First Premier and First Int'l agreed to take certain acts to facilitate the collection of unlawful debts:

a. First Int'l (or a Third-Party Sender acting on its behalf) agreed to "initiate" ACH debit entries to be originated on the ACH Network by First Premier whereby borrowers' bank accounts were debited and the unlawful debts collected in violation of 18 U.SC. § 1962(c);

b. First Premier agreed to "originate" ACH debit entries initiated by Illegal Payday Lenders and receive payment for doing so despite their unlawful nature by which the accounts were debited and the unlawful debts collected in violation of 18 U.S.C. §1962(c);

c. First Premier knew that First Int'l was a payday lender and that payday loans were illegal and unenforceable in Arizona, Arkansas, Connecticut, Georgia, Maryland, Massachusetts, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Vermont, West Virginia and the District of Columbia and still originated ACH debit entries into those states on behalf of the Illegal Payday Lenders in violation of 18 U.S.C. §1962(c).

132. Accordingly, First Premier intentionally conspired and agreed with First Int'l to use its gatekeeping role as an ODFI in the ACH Network to directly and indirectly conduct and participate in the conduct of the affairs of the ACH

Network Enterprise through the collection of unlawful debts in violation of 18 U.S.C. § 1962(c).

133. As a direct and proximate result of First Premier and First Int'l conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiff and the members of the Class and Sub-Class were injured in their property by the debiting of their bank accounts by First Premier on behalf of First Int'l and such injury was reasonably foreseeable.

### THIRD CLAIM FOR RELIEF
### Unjust Enrichment
### (On behalf of the Class and Sub-Class)

134. Plaintiff re-alleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

135. First Premier in its role as an ODFI, originated debit entries on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

136. First Premier charged and retained a transaction fee for each debit entry it originated on the ACH Network initiated by Illegal Payday Lenders (or Third-Party Senders acting on the Originator's behalf) that were in violation of state law, the NACHA Operating Rules and FDIC and OCC guidelines.

137. First Premier received and retained wrongful benefits from Plaintiff and the Sub-Class in the form of such transaction fees. First Int'l received and retained wrongful benefits from Plaintiff and the Sub-Class in the form of unlawful interest rates.

138. As a result of Defendants' wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Sub-Class.

139. Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

140. It is inequitable for Defendants to be permitted to retain the benefits they received, without justification, from making unlawful loans and originating debit entries on the ACH Network. Defendants' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

141. The financial benefits derived by Defendants rightfully belong to Plaintiff and members of the Sub-Class. Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiff and members of the Sub-Class all wrongful or inequitable proceeds received from them. A constructive trust should be imposed upon all wrongful or inequitable sums received by First Premier traceable to Plaintiff and the members of the Sub-Class.

142.   Plaintiff and members of the Sub-Class have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF
### Violations of Georgia Payday Lending Act by First Int'l
### (On behalf of the Sub-Class)

143.   Plaintiff incorporates by reference the preceding paragraphs.

144.   Pursuant to O.C.G.A. §16-17-2, it is unlawful to engage in any business which consists of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less, unless:

Such person is engaging in financial transactions permitted pursuant to:

(A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";

(B) The laws regulating state and federally chartered credit unions;

(C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;

(D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";

(E) Chapter 4 of Title 7, relating to interest and usury;

(F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or

(G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;

(2) Such loans are lawful under the terms of:

(A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";

(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or

(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;

(3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or

(4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

145.  As set forth more fully above and incorporated by reference herein, First Int'l made loans to Plaintiff in Georgia featuring a principal amount of less than $3,000 and does not qualify for any exception available under O.C.G.A. §16-17-2.

146.    Pursuant to O.C.G.A. §16-17-2(d):

Any person who violates subsection (a) or (b) of this Code section shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both. Each loan transaction shall be deemed a separate violation of this Code section. Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this subsection.

147. Pursuant to O.C.G.A. § 16-17-3, "[a] civil action under Code Section 16-17-2 may be brought on behalf of an individual borrower or on behalf of an ascertainable class of borrowers."

148. First Int'l violated the Georgia Payday Lending Act by making loans with unlawful interest rates in the State of Georgia.

149. As a result of the conduct of First Int'l, the Sub-Class was harmed.

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Georgia Payday Lending Act
(On behalf of the Sub-Class)

150. Plaintiff incorporates by reference the preceding paragraphs.

151. Pursuant to O.C.G.A. §16-17-2, it is unlawful to engage in any business which consists of making, offering, arranging, or acting as an agent in the making of loans of $3,000.00 or less, unless:

Such person is engaging in financial transactions permitted pursuant to:

(A) The laws regulating financial institutions as defined under Chapter 1 of Title 7, the "Financial Institutions Code of Georgia";

(B) The laws regulating state and federally chartered credit unions;

(C) Article 13 of Chapter 1 of Title 7, relating to Georgia residential mortgages;

(D) Chapter 3 of Title 7, the "Georgia Industrial Loan Act";

(E) Chapter 4 of Title 7, relating to interest and usury;

(F) Chapter 5 of Title 7, "The Credit Card and Credit Card Bank Act," including financial institutions and their assignees who are not operating in violation of said chapter; or

(G) Paragraph (2) of subsection (a) of Code Section 7-4-2 in which the simple interest rate is not greater than 16 percent per annum;

(2) Such loans are lawful under the terms of:

(A) Article 1 of Chapter 1 of Title 10, "The Retail Installment and Home Solicitation Sales Act";

(B) Article 2 of Chapter 1 of Title 10, the "Motor Vehicle Sales Finance Act"; or

(C) Part 5 of Article 3 of Chapter 12 of Title 44, relating to pawnbrokers;

(3) Subject to the provisions of paragraph (4) of subsection (b) of this Code section, such person is a bank or thrift chartered under the laws of the United States, a bank chartered under the laws of another state and insured by the Federal Deposit Insurance Corporation, or a credit card bank and is not operating in violation of the federal and state laws applicable to its charter; or

(4) Such loan is made as a tax refund anticipation loan. In order to be exempt under this paragraph the tax refund anticipation loan must be issued using a borrower's filed tax return and the loan cannot be for more than the amount of the borrower's anticipated tax refund. Tax returns that are prepared but not filed with the proper government agency will not qualify for a loan exemption under this paragraph.

152.  As set forth more fully above and incorporated by reference herein, the Illegal Payday Loans made to Plaintiff in Georgia featured a principal amount of less than $3,000 and neither the Illegal Payday Lender nor the Illegal Payday Loan qualified for any exception available under O.C.G.A. §16-17-2.

153.  Pursuant to O.C.G.A. §16-17-2(d):

Any person who violates subsection (a) or (b) of this Code section shall be guilty of a misdemeanor of a high and aggravated nature and upon conviction thereof shall be punished by imprisonment for not more than one year or by a fine not to exceed $5,000.00 or both. Each loan transaction shall be deemed a separate violation of this Code section. Any person who aids or abets such a violation, including any arbiter or arbitration company, shall likewise be guilty of a misdemeanor of a high and aggravated nature and shall be punished as set forth in this subsection.

154. Pursuant to O.C.G.A. § 16-17-3, "[a] civil action under Code Section 16-17-2 may be brought on behalf of an individual borrower or on behalf of an ascertainable class of borrowers."

155. First Premier aided and abetted the Illegal Payday Lenders' violations of the Georgia Payday Lending Act by providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme.

156. In providing the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme, First Premier knowingly provided substantial assistance to—and profited from—the illegal lending activities of the Illegal Payday Lenders.

157. At the time First Premier provided the necessary access to the ACH Network to carry out the Illegal Payday Lenders' illegal scheme, it knew the identity of the Illegal Payday Lenders, including their unlawful activity.

158. First Premier was prohibited by NACHA Rules from honoring ACH transactions on unlawful payday loans.

159.   First Premier was aware of the illegal nature of the lending activities of the Illegal Payday Lenders through due diligence procedures.

160.   As a result of First Premier's conduct, the Sub-Class was harmed.

161.   As a result of First Premier's knowing participation in the making of illegal payday loans, it is liable as an aider and abettor to the violations of the Georgia Payday Lending Act referenced herein.

**WHEREFORE**, Plaintiff on her own behalf and on behalf of the Class seeks judgment in an amount to be determined at trial but not less than $5,000,000, as follows:

(a)      Under 18 U.S.C. § 1964(c), awarding each  member of Class and Sub-Class damages from Defendants' violations of 18 U.S.C. § 1962(c) consisting of a refund of every ACH debit from their accounts in which First Premier was the ODFI and which represented repayment of a loan from First Int'l, trebled;

(b)      Under 18 U.S.C. § 1964(c), awarding each member of the Class and Sub-Class damages from Defendants' violations of 18 U.S.C. § 1962(d) consisting of a refund of every ACH debit from their account in which First Premier was the ODFI and which represented repayment of a loan from First Int'l, trebled;

(c)     Permitting each member of the Class and Sub-Class to recover damages in restitution *at law* from First Premier consisting of a refund of every ACH debit from their accounts in which First Premier was the ODFI and which represented repayment of a loan from First Int'l;

(d)     Awarding the Sub-Class damages against First Int'l for its violations of the Georgia Payday Lending Act;

(e)     Awarding the Sub-Class damages against First Premier for its aiding and abetting  in the violations of the Georgia Payday Lending Act;

(f)     Awarding Plaintiff attorneys' fees and costs in pursuing this action; and

(g)     Awarding such other and further relief as this arbitral forum deems just, proper and equitable.

Dated: January 6, 2015

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

By: /s/ Steve Six
Steve Six
Darren Kaplan
J. Austin Moore
460 Nichols Road, Suite 200
Kansas City, MO 64112
Tel: (816) 714-7100
Fax: (816) 714-7101
six@stuevesiegel.com
kaplan@stuevesiegel.com
moore@stuevesiegel.com

**KOPELOWITZ OSTROW P.A.**
Jeffrey M. Ostrow
Jason H. Alperstein
200 S.W. 1st Avenue, 12th Floor
Fort Lauderdale, Florida 33301
Tel: (954) 525-4100
Fax: (954) 525-4300
ostrow@KOlawyers.com
alperstein@KOlawyers.com

**TYCKO & ZAVAREEI LLP**
Hassan A. Zavareei
Jeffrey D. Kaliel
2000 L Street, N.W.
Suite 808
Washington, D.C. 20036
Tel: (202) 973-0900
Fax: (202) 973-0950
hzavareei@tzlegal.com
jkaliel@tzlegal.com

*Counsel for Plaintiff and the Class*

# EXHIBIT B

| Loan Note and Disclosure: # ▓▓▓▓▓▓ | First International SRS |
|---|---|
| LISA FLAGG | 8/09/2012 2:22:59 PM |

**PARTIES:** In this Loan Note and Disclosure (Note) you are the person named as a Borrower above. We **First International SRS** are the lender (the Lender). All references to we, us or ourselves mean the Lender. Unless this note specifies otherwise or unless we notify you to the contrary in writing, all notices and documents you are to provide us with shall be provided to **First International SRS** at the fax number and address specified in this Note and in your other loan documents.

**THE ACCOUNT:** You have deposit account number ▓▓▓▓▓ (Account) at CHASE (bank). You authorize us to the effect a credit entry to deposit the proceeds (the Amount Financed indicated below) to your account at the bank.

**DISCLOSURE OF CREDIT TERMS:** The information in the following disclosure is part of this note

| ANNUAL PERCENTAGE RATE The cost of credit as a yearly rate.(e) | FINANCED CHARGE The dollar amount the credit will cost you | AMOUNT FINANCED. The amount of credit provided to you or on your behalf | TOTAL OF PAYMENT DUE The amount you will Pay if you do not exercise your renewal option |
|---|---|---|---|
| 899.46% | $85.00 | $250.00 | $335.00 |

Your **Payment Schedule** will be: 1 payment of $(335.00) due on the (08/31/2012), if you decline the option of renewing your loan. If you opt to renew your loan and your renewal is accepted, you will pay the finance charge of $ (335.00), on (08/31/2012). If your pay day falls on the weekend or holiday and you have direct deposit, your account will be debited the business day prior to your normal date. You will accrue new finance charges with every renewal of your loan.

*To decline the option of renewals you must contact us three business days prior to your loan due date.

**SECURITY:** This loan is unsecured

**ITEMIZATION OF AMOUNT FINANCED** of $(250.00): given to you directly; $(250.00): paid on your account $(250.00)

**PROMISE TO PAY:** You promise to pay us to our order and our assignees, on the date indicated in the Payment Schedule, the Total of Payments, unless this note is renewed. If this Note is renewed, then on the Due Date, you will pay the Finance Charge shown above. This Note will be renewed on the Due Date, unless at least three Business days before the Due Date, either you tell us you do not want to renew the Note or we tell you that the Note will not be renewed. Information regarding the renewal of your loan will be sent to you prior to any renewal showing the Due Date, fiance charge, and all other disclosures. As used in the Note, the term Business Day'means a day other than Saturday, Sunday or legal holiday, that **(First International SRS)** is open for business. Any Payment due on the Note shall be made by us effecting one or more ACH debit entries to your Account at the Bank. You authorize us to effect this payment by these ACH debit entries. You may revoke this authorization at any time up to 3 business day prior to the date any payments become due on this Note. However, if you timely revoke authorization, you authorize us to collect the payments due by using your debit card information that you provided to us on your application (this will be done as a POS transaction).This may be done in one or multiple amounts using various debits until the amount you owe is paid in full.

Additionally, if the account you have provided to us for your ACH debit has been closed or funds are not available at the time of our scheduled debit, you authorize us to debit any account that you hold and that we have information on provided by you. If your Account is with us, you authorize us to deduct the payment from your Account on the day the loan comes due

**RETURN ITEM FEE:** If sufficient funds are not available in the Account on the due date to cover ACH debit entry or check, you agree to pay us a Return Item Fee of $35

**PREPAYMENT:** The Finance Charge consists solely of a Loan fee that is earned in full at the time Loan is funded. You may pay all of what you owe prior to the due date, without penalty. However, if you pay early you will not be entitled to a refund of part or all of the Finance Charge.

**GOVERNING LAW:** Both parties agree that this Note and your account shall be governed by all applicable federal laws and all laws of the jurisdiction in which the Lender is located, regardless of which state you may reside, and by signing below or by your electronic signature, you consent to the exclusive exercise of regulatory and adjudicatory authority by the jurisdiction in which the Lender is located over all matters related to the Note and your account, forsaking any other jurisdiction which either party may claim by virtue of its residency.

**AUTHORIZATION AGREEMENT FOR THE PREAUTHORIZED PAYMENT**

1. YOU must VERIFY BANK, RESIDENCE, AND EMPLOYMENT INFORMATION as printed in items 5 and 6 below. Sign and date where indicated by the (X) below

2. Unless the Authorization in item 6 below is properly and timely revoked, THERE WILL BE $(35.00) FEE ON ANY ACH DEBIT ENTRY ITEMS THAT ARE RETURNED AT TIME OF COLLECTION

3. YOU authorize us to contact you regarding your loan at your place of employment or residence at any time up to 9.00PM your local time

4. You represent that you have NOT RECENTLY FILED FOR BANKCRUPCY AND HAVE NO PRESENT INTENTIONS OF DOING SO

5. You represent that your residence remains ███████████████████████ and that your employer remains ()

6. You authorize Us, **First International SRS** our servicer, agent, affiliate to initiate one of more ACH debit entries (for example, at our option, one debit entry may be initiated for the principle of the loan and another for the finance charge) to your Deposit Account indicated below for the payments that comes due each pay period and/or each date concerning every renewal, with regard to the loan for which you are applying. The Depository Institution named below, called BANK, is the one that will receive such entry to your Checking Account.

A. BANK Name: CHASE

B. Transit/ABA No. ████████████

C. Checking Account No. ████████

This authorization becomes effective at the time we make the loan for which you are applying and will remain in full force and effect until we have received notice of revocation from you. It does not authorize us to make debit entries with regard to any other loan. You may revoke this authorization to effect ACH debit entries to your Account by giving written notice of revocation to us, which to be effective must be received to us not later that 3.00 PM Eastern time, three business days prior to the due date of your loan. However, if you timely revoke authorization, you authorize us to collect the payments due by using your debit card information that you provided to us on your application (this will be done as a POS transaction). This may be done in one or multiple amounts using various debits until the amount you owe is paid in full. If the account you have provided to us for your ACH debit has been closed or funds are not available at the time of your scheduled debit, you authorize us to debit any account that you hold that we have information on provided by you.

A. Renewal. Your loan will be renewed on every *due date unless you notify us of your desire to pay in full. You will accrue a new finance charge every time your loan is renewed. Any finance charges accrued will not go toward the principle amount owed.

B. Pay Off. You can pay off your full balance, the principle and the finance charge for that period. To accept this option you must notify us of your request. The request must be received at least three full business days before your loan is due.

8. BY ELECTRONICALLY SIGNING THIS AGREEMENT, YOU ACKNOWLEDGE STATEMENTS 2, 3, 4, AND 5 AND AGREE TO THE AUTHORIZATIONS IN ITEMS 6, AND THE PAYMENT OPTIONS IN ITEMS 7.

9. Should you wish to contact us please use the details below

**First International SRS**
**524 West 9320 South**

**Sandy, UT84070**
**Phone : 8003660566**
**Fax: 8888847780**

Date: X 8/09/2012 2:22:59 PM

Authorization: Yes I agree to all the terms of the Loan Agreement

Sign Your Name: X LISA FLAGG

**AGREEMENT TO ARBITRATE ALL DISPUTES:** By signing below and to induce us, (First International SRS), to process your application for a loan, you and we agree that any and all claims, disputes, or controversies that we or our services or agents have against you or that you have against us, our services, agents, directors, officers and employees. That arises out of your application for one or more loans, the Loan Agreements that govern your repayment obligations, the loan for which you are applying or any other loan that we previously made or later makes to you, this Agreement To Arbitrate All Disputes, collection of the loan or loans, or alleging fraud or misrepresentation, whether under the common law or pursuant to federal or state stature or regulation, or otherwise, including disputes as to the matters subject to arbitration, shall be resolved by a binding individual(and not class) arbitration by and under the Code of Procedure of the National Arbitration Forum(NAF) in effect at the time the claim is filed. THEREFORE, THE ARBITATION SHALL NOT CONDUCT CLASS ARBITRATION.THAT IS: THE ARBITRATOR SHALL NOT ALLOW YOU TO SERVE AS A REPRESENTATIVE, AS A PRIVATE ATTORNEY GENERAL, OR IN ANY OTHER REPRESENTATIVE CAPACITY FOR OTHERS IN THE ARBITRATION. This Agreement to Arbitrate All Disputes shall apply no matter by whom or against whom the claim is filled. Rules and forms of the NAF may be obtained and all claims shall be filed at any NAF office, on the World Wide Web at www.arb-forum.com, or at National Arbitration Forum, P.O Box 50191, Minneapolis, Minnesota 55405. If you are unable to pay costs at arbitration, your arbitration fees may be waived by the NAF. The cost of a participatory hearing, if one is held at your or our request will be paid solely by us if the amount of the claims is $15,000 or less. Unless otherwise ordered by the arbitrator, you and we

agree to equally share the costs of a participatory hearing if the claim is for more than $15,000 or less than $75,000. Any participatory hearing will take place near your residence. The arbitration agreement is made pursuant to a transaction involving interstate commerce. It shall be governed by the Federal Arbitration Act 9 U.S.C. Sections 1 ~16. Judgement upon the reward may be entered by any party in any court jurisdiction. This Agreement to Arbitrate All Disputes is an independent agreement and shall survive the closing, funding, repayment and/or default of the loan for which you are applying.

**NOTICE:** You and we would have had a right or opportunity to litigate disputes through a court and have a judge or jury decide the disputes but have agreed instead to resolve disputes through arbitration.

**AGREEEMENT NOT TO BRING, JOIN OR PARTICIPATE IN CLASS ACTIONS:** To the extent permitted by law, by signing below you agree that you will not bring, join or participate in any class action as to any claim, dispute, or controversy you may have against us or our agents, servicers, directors, officers and employees. You agree to the entry of injunctive relief to stop such a lawsuit or remove you as a participant in the suit. You agree to pay the costs we incur, including our court costs and attorneys fees, in seeking such relief. This agreement is not to waiver, is not a waiver of any of your rights and remedies to pursue a claim individually and not as a class action in binding arbitration as provided above. This agreement not to bring joins or participate in class action suits is an independent agreement and shall survive the closing, funding, repayment and/or default of the loan for which you are applying.

**SURVIVAL:** The provisions of this Note dealing with the Agreement to Arbitrate All Disputes and the Agreement Not to Bring, Join or Participate in Class Actions shall survive repayment in full and/or default of this Note

**NO BANKRUPTCY:** By signing below or electronically signing you represent that you have not recently filed for bankruptcy and you do not plan to do so

**NOTICE:** We adhere to the Patriot Act and we are required by law to adopt procedure to request and retain in our records information necessary to verify your identity. By signing or electronically signing this Loan Note you certify that all information provided above is true, complete and correct and provided to us **First International SRS**, for the purpose of inducing us to make the loan for which you are applying. By signing below or electronically signing you also agree to the Agreement to Arbitrate All Disputes and Agreement Not to, join or Participate in Class Action. By signing or electronically signing this application you authorize**First International SRS** to verify all information that you have provided and acknowledge that this information may be used to verify certain past and/or current credit or payment history information for third party source(s). **First International SRS** may utilize

(third party credit checking company) or other similar consumer reporting agency for these purposes. We may disclose all or some of our public personal information about you and that we collect to financial service providers that perform services on our behalf, such as the servicer of your short term loan, and to financial institutions with which we have joint marketing arrangements. Such disclosures are made as necessary to effect, administer and enforce the loan you may request or authorize with other financial institutions with regards to the processing, funding, repayment and collection of the Loan. (This application will be deemed incomplete and will not be processed by us unless signed below)

Date: X 8/09/2012 2:22:59 PM

Authorization: Yes I agree to all the terms of the Loan Agreement

Sign Your Name: X LISA FLAGG

**PRIVACY STATEMENT**

You or Your means you as a participant in or as a user of **First International SRS** program. We or our or Us means **First International SRS**

All Information transmitted, printed or otherwise submitted to **First International SRS** shall be deemed to be the property of **First International SRS** and we shall be free to use such information for any lawful purpose as detailed herein

We reserve the right to release such information to law enforcement or other governmental officials as we, in our sole and absolute discretion, deem necessary to comply with law.

SECTION ONE. Collected Information

We automatically collect and/or track the following:

(1) Information knowingly provided by you through online forms, registration forms, surveys, and or other entries, such as email addresses, personal, financial or demographic information.

(2) Information, user specific or aggregate , on what pages our visitors access

(3) The email addresses of visitors that communicate with **First International SRS**

SECTION TWO. Use Data Collected

We use your personal, demographic and profile data to enhance your experience at our company and to enable us to present content we think you might be interested in. We use your contact information to send you information about our company and promotional material from our partners. We may also use your personal, Demographic and profile data to improve our company, for statistical analysis, for marketing and promotional purposes, and for editorial or feedback purposes for our advertisers. Information collected by us may be added to our databases and used for future emails or postal mailings regarding site Updates, new products and services, upcoming events, and/or status of orders placed online

SECTION THREE. Disclosure of Data to third parties

If you choose to provide personal information, it will be used for the following purposes:

(1) Considering you for an **First International SRS** account

(2) Sharing of your information with trusted third parties such as credit bureaus and or other financial service providers as required by law

(3) For marketing products and services which we determine, in our sole judgment that you might find of interest. We reserve the right to share, rent, sell, or otherwise disclose data we collect to third parties. Any third parties we share, rent, sell. Or otherwise disclose data to will be carefully prescreened by us, determine, by us to be reputable, and will use the personal data for marketing products and services which we determine, in our sole judgment, that you might find of interest

SECTION FOUR. Your optout rights

You may optout of receiving communication from us and or our partners by not submitting your information. We also allow you to removeyour information from our database. If you remove your information from our database it will no longer be used for second purposes, disclosed to third parties, or used by us or third parties to send promotional correspondences to you. You can remove your information by sending your requesting writing via fax to 8888847780.

SECTION FIVE. Your rights to your personal data

Upon request via postal mail or email, we will provide you a summary of personal information retained by us. We will only send your personal records to your email address or postal address we have you on file for you. You may modify, correct, change, or update your personal record or remove you personal record from our database by sending your request in writing via email.

SECTION SIX.

We do not intend to collect data from children the information and services provided us to out affiliates, sponsors, and advertisers are not intended to be viewed by children (under 18 years old). No information collected from children is knowingly used for any marketing or promotional purposes whatsoever, either inside or outside **First International SRS**.

SECTION SEVEN. Our rights to contact you

We reserve the right to contact you regarding your account status and changes to subscriber agreements, privacy policy or any other policies or agreements relevant to you.

SECTION EIGHT. Our right to change.

We reserve the right to change this policy at any time by notifying you of the existence and location of the new or revised privacy policy or by posting the changes online at out site

SECTION NINE. Our contact information

If you have any questions about this privacy statement, the practises of company you can contact us via email sent

Our Commitment to You:

Once your information has been verified, we will ACH (deposit) the loan proceeds into your checking account. If we receive your information by 4.30PM, EST and it is verified, funds will be in your account the next business day. Holidays will delay ACH deposits by one day.

At **First International SRS** we value your business. We are dedicated to being prompt and courteous so that you, the customer, will know you have received the best customer service possible not only now, but also for the future.

Application Supplement:

Short term loans provide the cash needed to meet immediate shortterm cash flow problems. They are not a solution for longer term financial problems for which other kinds of financing may be more appropriate. You may want to discuss your financial situation with a nonprofit financial counselling service in your community.

YOU WILL BE CHARGED ADDITIONAL FEES IF YOU RENEW THIS LOAN

| LOAN CANCELLATION FORM |
| --- |

**RIGHT TO CANCEL. YOU MAY CANCEL THIS LOAN, WITHOUT COST OR FURTHER OBLIGATION TO US, IF YOU DO SO BY THE END OF BUSINESS ON THE BUSINESS DAY AFTER YOU SUBMIT THE LOAN NOTE AND DISCLOSURE TO US.** To cancel, call us at 8003660566 to alert us of your intention to cancel. You must also complete the information in this box, sign and either return this page by telefax to us at 8888847780. If you follow these procedures but there are insufficient funds available in your deposit account to enable us to reverse the transfer of loan proceeds at the time we effect an ACH debit entry of your bank account, your cancellation will not be effective and you will be required to pay the loan and our charges on the scheduled maturity date.

**YOU WISH TO CANCEL.** You authorize us to initiate a debit entry to your bank account for the amount of the loan proceeds we deposited to that account at your request.

STOP! DO NOT SIGN BELOW OR RETURN THIS PAGE TO US UNLESS YOU WANT TO CANCEL THIS LOAN.

X_____          _____
Signature                         Date

**EXHIBIT B**



January 8, 2015


Lisa L. Flagg
c/o Stueve Siegel Hanson LLP
Stephen N. Six
460 Nichols Road, Suite 200
Kansas City, Missouri 64112


Dear Mr. Six,

We are in receipt of your enclosed correspondence.

Please be advised that we are no longer able to accept arbitration claims involving consumers pursuant to a Consent Judgment entered in Hennepin County District Court in July 2009 between the Minnesota Attorney General and the National Arbitration Forum.

In view of the above, your correspondence is being returned to you and no file has been opened regarding this matter.

Sincerely,

Lynda N.

Lynda N.
Case Coordinator


National Arbitration Forum (FORUM)
P.O. Box 50191
Minneapolis, MN 55405
Phone 800. 474. 2371
Fax 866. 743. 4517
www.adrforum.com